ACCEPTED
03-14-00808-CV
5443753
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/27/2015 9:45:13 PM
JEFFREY D. KYLE
CLERK

# No. 03-14-00808-CV

**IN THE 3RD COURT OF APPEALS**
**AUSTIN, TEXAS**

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/27/2015 9:45:13 PM
JEFFREY D. KYLE
Clerk

**Rosendo Morales, *Appellant***
**V.**
**Texas Department of Insurance-Division of Workers'**
**Compensation and Commissioner Ryan Brannan, in his official**
**capacity, *Appellees***

**On appeal from the 146th District Court of Bell County, Texas;**
**Cause No. 269,135-B, the Honorable Jack Weldon Jones**
**Presiding**

## ROSENDO MORALES APPELLANT'S BRIEF

BRADLEY DEAN McCLELLAN
State Bar No. 13395980
Richard Pena
Law Offices of Richard Pena, P.C
State Bar No. 00000073
Law Offices of Richard Pena, P.C.
1701 Directors Blvd., Suite 110
Austin, Texas 78744
Brad.McClellan@yahoo.com
(512) 327-6884 telephone
(512) 327-8354 facsimile
*Counsel for Appellant*

May 27, 2015
**Oral Argument Requested**

# IDENTITY OF PARTIES & COUNSEL

*PLAINTIFF/APPELLANT:*
Rosendo Morales c/o
Law Offices of Richard Pena, P.C.
1701 Directors Blvd.
Austin, Texas 78744

*TRIAL AND APPELLATE ATTORNEY FOR PLAINTIFF:*
Bradley Dean McClellan
State Bar No. 13395980
Richard Pena
Law Offices of Richard Pena, P.C
State Bar No. 00000073
1701 Directors Blvd. Suite 110
Austin, Texas 78744
Brad.McClellan@yahoo.com
Fax 512.327.8354
Telephone 512.327.6884

*DEFENDANT/APPELLEE:*
Texas Department of Insurance – Division of Workers' Compensation, DWC, a governmental unit organized and existing under the law of the State of Texas, and Commissioner Ryan Brannan, in his official capacity
7551 Metro Center Drive, Suite 100
Austin, TX, 78744

*Attorneys for DWC and Commissioner:*
Adrienne Butcher,
Assistant Attorney General
Administrative Law Division
Office of the Attorney General of Texas

P.O. Box 12548 (MC-018), Capital Station
Austin, Texas 78711-2548
512-475-4208
512-320-0167 facsimile.
Addrienne.butcher@texasattorneygeneral.gov
Attorneys for DWC and Commissioner

*OTHER DEFENDANT BELOW:*
Texas Mutual Insurance Company, the Insurance Carrier
c/o
Scott Placek
Matthew Foerster
Arnold & Placek, LLC
203 East Main Ave, Ste. 203
Round Rock, TX 78664
Fax: 512 341.7121
Attorneys for Defendant TMIC

ii

# TABLE OF CONTENTS

TABLE OF AUTHORITIES     iv-vi

IDENTITY OF PARTIES & COUNSEL     ii

STATEMENT OF THE CASE     vii

ISSUES PRESENTED     ix

ROSENDO MORALES APPELLANT'S BRIEF     1

SUMMARY OF ARGUMENT     6

STATEMENT OF FACTS     3

ARGUMENT & AUTHORITIES     10
  Issue No. 1: Whether the District Court has jurisdiction to determine a declaratory judgment action brought to properly construe, interpret, and enforce applicable Texas statutes against the state agency and the head of the state agency after administrative remedies have been exhausted and a live controversy remains with allegations that the state defendants have violated the statutes in question by failing to properly apply the law?     10

CONCLUSION     43

PRAYER     44

CERTIFICATE OF COMPLIANCE     46

CERTIFICATE OF SERVICE     46

APPENDIX     47

# INDEX OF AUTHORITIES

## Cases

*Beacon Nat 'I Ins. Co. v. Montemayor,* 86 S.W.3d 260, 267 (Tex. App.-Austin 2002, no pet.) ........................................................................................................ 30

*Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554-55 (Tex. 2000) ............... 33

*Brooks v. Northglen Ass'n,* 141 S.W.3d 158, 163 (Tex. 2004) ..................... 10, 18

*Calvert v. Employees Ret. Sys. of Tex.,* 648 S.W.2d 418, 419 (Tex. App.--Austin 1983, writ ref'd n.r.e.) ........................................................................... 34

*Campos v. Texas Prop. & Cas. Ins. Guar. Ass'n,* 282 S.W.3d 226, 230 (Tex. App.—Austin 2009, no pet.) ......................................................................... 17

*City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 n.6 (Tex. 2009) ................... 12

*City of McKinney v. Hank's Rest. Group, L.P.*, 412 S.W.3d 102, 112 (Tex. App.—Dallas 2013, no pet.) ....................................................................... 12

*Cobb v. Harrington*, 144 Tex. 360, 190 S.W.2d 709, 712 (1945) ..................... 35

*Harvel v. Tex. Dep't of Ins.-Div. of Workers' Comp.*, 13-14-00095-CV, 2015 Tex. App. LEXIS 5159, 2015 WL 2452703 (Tex. App. Corpus Christi--May 21, 2015, motion for rehearing to be filed) ........................................... 12

*Hawkins v. El Paso First Health Plans, Inc.*, 214 S.W.3d 709, 716-18 (Tex. App.--Austin 2007, *pet. filed*). ................................................................... 35

*Houston General Insurance Co. v. Association Casualty Insurance Co.,* 977 S.W.2d 634 (Tex. App.—Tyler, *no pet.*) ................................................. 43

*Howell v. Texas Workers' Compensation Com'n,* 143 S.W.3d 416, 433 (Tex. App.--Austin 2004, *pet. denied*). .................................................................. 43

*Kuntz v. Khan*, No. 03-10-00 160-CV, 2011 Tex. App. LEXIS 446, 2011 WL 182882,(Tex. App.--Austin 2011, no pet.) ............................................... 30

*Mid-Century Insurance Company v. Texas Workers' Compensation Commission,* 187 S.W.3d 754 (Tex. App.—Austin 2006, *no pet.*). ............... 39

*Nat'l Am. Ins. Co. and TDI-DWC and Commissioner Bordelon in his official capacity v. Tex. Prop. & Cas. Ins. Guar. Ass'n*, No. 03-09-00680-CV, 2013 WL 4817637, 2013 Tex. App. LEXIS 10865 (Tex. App.--Austin Aug. 28, 2013, no pet.) ............................................................................ 8, 18

*Nat'l Am. Ins. Co. v. Tex. Prop. & Cas. Ins. Guar. Ass'n for Paula Ins. Co.,* 2013 Tex. App. LEXIS 10865, 2013 WL 4817637 (Tex. App.--Austin Aug. 28, 2013, no pet.) ......................................................................................... 35

*Roal Global Corp. v. City of Dallas,* 2015 Tex. App. LEXIS 5205 (Tex. App. Dallas--May 21, 2015, no pet. h.) .................................................................. 12

*Severiano DeLeon v. Royal Indemnity Company,* 396 S.W.3d 597 (Tex. App.--Austin 2010) rev'd on other grounds *Severiano DeLeon v. Royal Indem. Co.,* 396 S.W.3d 527 (Tex. 2012) ............................................ 25, 26

*Spawglass Constr. Corp. v. City of Houston*, 974 S.W.2d 876, 878 (Tex. App.--Houston [14th Dist.] 1998, pet. denied) ................................ 34

Subchapter F of Chapter 410 .............................................................. 16

*Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993) .. 32

*Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex.2004) 32

*Tex. DOT v. Sefzik*, 355 S.W.3d 618, 621-622 (Tex. 2011). ................. 14

*Tex. Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994). ....... 13

*Tex. Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 634-35 (Tex. 2010) .................................................................................. 13

*Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 859-60 (Tex. 2002) ................................................................................ 13

*Tex. Prop. & Cas. Guar. Ass'n v. Nat'l Am. Ins. Co.,* 208 S.W.3d 523, 533 (Tex. App.--Austin 2006, pet. denied). ....................................... 15

*Tex. Workers' Compensation Ins. Fund v. Tex. Workers' Compensation Comm'n & Watts*, 124 S.W.3d 813, 820 (Tex. App.--Austin 2003, *pet. denied*) ................................................................................ 20, 22

*Texas Ass'n of Business v. Texas Air Control Bd.*, 852 S.W.2d 440 at 446 (Tex. 1993) ...................................................................................... 33

*Texas Dep. of Ins., Div. of Workers' Compensation v. Lumbermens Mut. Cas. Co.*, 212 S.W.3d 870 (Tex App.—Austin 2006, *pet. denied*) .............. 8, 20, 24

*Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex.1994) .......... 37

Texas Government Code section 2001.171 .......................................... 16

*Texas Liquor Control Bd. v. Canyon Creek Land Corp.,* 456 S.W.2d 891, 895 (Tex.1970) ...................................................................................... 38

*Texas Mun. Power Agency v. Public Util. Comm'n*, 100 S.W.3d 510, 520 (Tex. App.--Austin 2003, *pet. denied*) ................................................. 39

*Texas Mun. Power Agency v. Public Utility Com'n of Texas,* 253 S.W.3d 184, 189 (Tex. 2007) ............................................................................. 37

*Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002) ...................................................................................... 35

*Texas State Employees Union/CWA Local 6184 v. Texas Workforce Comm'n,* 16 S.W.3d 61, 65 (Tex. App.-Austin 2000, *no pet.*). ......................... 33

*Texas Workers' Compensation Commision v. Garcia, 893 S.W.2d 504 (Tex. 1995)* ............................................................................................ 38

*Young Chevrolet, Inc. v. Tex. Motor Vehicle Bd.*, 974 S.W.2d 906,911 (Tex. App.--Austin 1998, pet. denied) ...................................................... 31

**Statutes**

Tex. Civ. P. & Rem. Code § 37.006.................................................................. 10, 18

Tex. Civ. Prac. & Rem. Code §37.003(a) ................................................................ 43

Tex. Civ. Prac. & Rem. Code §5.062(a) ................................................................. 43

TEX. INS. CODE § 462.017(b) ................................................................................ 17

Tex. Lab. Code  §410.204(a)................................................................................. 22

TEX. LAB. CODE § 408.123(a). ............................................................................. 27

TEX. LAB. CODE § 410.252(b) .............................................................................. 17

Texas Labor Code § 410.254................................................................................. 7

Texas Labor Code §410.252(b)(1) ..................................................................... 17

Texas Labor Code Section 401.011(12)............................................................. 7

Texas Labor Code Section 408.124(c) .............................................................. 26

Texas Labor Code Sections 401.011(23) & (24) ............................................ 27

**Other Authorities**

*Camp v. Greene County Tech. et. al*, decided October 17, 2008, 2008 WL
    4686198 (Ark.Work.Comp.Com.)                                                     29

DWC APPEAL NO. 050140, 2005 TX Wrk. Comp. LEXIS 57 (decided March
    14, 2005)                                                                        40

DWC APPEAL NO. 94994, 1994 TX Wrk. Comp. LEXIS 6081, September 9,
    1994                                                                             41

DWC APPEAL NO. 951802, 1995 TX Wrk. Comp. LEXIS 4964, December 13,
    1995                                                                             42

DWC Appeal No. 990005, 1999 TX Wrk. Comp. LEXIS 3029, decided
    February 19, 1999                                                                42

DWC Appeals Panel Decision No. 080375, May 15, 2008, 2008 WL 2233469
                                                                                     28

DWC Appeals Panel No. 071023-s, decided July 23, 2007, 2007 TX Wrk.
    Comp. LEXIS 54.                                                                  40

**STATEMENT OF THE CASE**

This case involves primarily questions of law and statutory violations by a state agency and agency official and the workers' compensation insurance carrier which arose out of an actual workers' compensation dispute and the improper interpretation and application of the Legislature's statutory terms by both the workers' compensation insurance carrier and the Texas Department of Insurance-Division of Workers' Compensation (DWC), which is the state agency charged with properly applying, enforcing, and interpreting the Texas Labor Code and Texas Insurance Code along with the DWC Commissioner in his official capacity. Rosendo Morales is the injured Texas worker. The injured worker has workers' compensation coverage through the other Defendant below, the Texas Mutual Insurance Company. The administrative judge ruled in favor of the Defendant Insurance Carrier, and Rosendo Morales appealed and the final DWC administrative decision as improperly limiting his impairment rating to not include the four level cervical fusion and seeking declaratory judgment relief. CR 47. Rosendo Morales filed for judicial review in the 146th District Court of Bell County challenging the final DWC determinations and seeking a declaratory judgment of proper statutory enforcement and interpretation under the Texas Labor Code and the Texas

Insurance Code. CR 4, 47. The DWC filed an original answer and general denial in part arguing sovereign immunity from suit. CR 74. Texas Mutual, the Insurance Carrier, finally answered and filed special exceptions. CR 21. The Honorable Judge Jack Jones granted the DWC Defendants' plea to the jurisdiction and dismissed the DWC and the Commissioner from the lawsuit, and he granted Texas Mutual's Plea to the Jurisdiction, CR 288-289. Plaintiff brings this interlocutory appeal challenging the plea to the jurisdiction dismissing DWC and the DWC Commissioner from the case and granting DWC's plea to the jurisdiction.

## ISSUE PRESENTED

Issue No. 1: Whether the District Court has jurisdiction to determine a declaratory judgment action brought to properly construe, interpret, and enforce applicable Texas statutes against the state agency and the head of the state agency after administrative remedies have been exhausted and a live controversy remains with allegations that the state defendants have violated the statutes in question by failing to properly apply the law?

# No. 03-14-00808-CV

**IN THE 3ᴿᴰ COURT OF APPEALS**
**AUSTIN, TEXAS**

---

**Rosendo Morales,** *Appellant*
**V.**
**Texas Department of Insurance-Division of Workers'
Compensation and Commissioner Ryan Brannan, in his official
capacity,** *Appellees*

---

**On appeal from the 146ᵗʰ District Court of Bell County, Texas;
Cause No. 269,135-B, the Honorable Jack Weldon Jones
Presiding**

---

## ROSENDO MORALES APPELLANT'S BRIEF

---

**To the Honorable Justices of the 3ʳᵈ Court of Appeals:**

A state agency is not free to misinterpret and misapply the laws of the
Texas Legislature, and the Courts of this State are duty bound to make sure
the laws of this State are properly applied, interpreted and enforced. Texas
citizens have a right to seek declaratory judgments concerning statutory
rights especially where administrative remedies have been exhausted. This
Court previously allowed a declaratory judgment action against the DWC in
*Tex. Dep't of Ins. v. Lumbermens Mut. Cas. Co.,* 212 S.W.3d 870 (Tex. App.—
Austin 2006, pet. denied), which resulted in erroneous applications of the law

from dicta. For almost a decade now, the *Lumbermens* declaratory judgment decision unleashed the DWC and the Commissioner and insurance carriers such as Texas Mutual, to erroneously deprive severely injured workers like Mr. Morales proper impairment ratings. Workers who undergo insurance carrier approved and paid for spinal fusion surgeries occurring before the worker's recovery stabilizes at maximum medical improvement must have such surgeries and the effects of such surgeries considered and rated when impairment ratings are assigned.

A state agency may not prevent a parties challenge that a statute is not being properly applied, interpreted and enforced. The state agency is a necessary party for such a declaration, and such a declaration would be unenforceable without the proper state agency. The final decision of the Texas Department of Insurance-Division of Workers' Compensation and Commissioner Brannan, collectively the DWC, refused to allow a proper rating for a four level cervical spinal fusion surgery which occurred prior to maximum medical improvement.

The Defendants, the Texas Department of Insurance-Division of Workers' Compensation, DWC, and the Commissioner and the Defendant Texas Mutual Insurance Carrier, appear to wish to avoid clear legal statutory

construction and proper statutory application questions raised by the Plaintiff, Rosendo Morales, the injured worker. Mr. Morales believes his legal positions are correct, but the Defendants apparently do not want a clear statement of the law even though in other cases the Defendants have sought declaratory legal determinations.

This case involves a proper request for declaratory judgment with a challenge to the DWC Defendants improper enforcement of the law. A justiciable controversy exists; exhaustion of administrative remedies occurred; and clear questions of law concerning statutory interpretations and failure to apply and enforce the law properly exist. Mr. Morales asserts the legal declarations should be decided in his favor and help bring an end to this litigation and protect his right to the limited recovery of workers' compensation benefits for impairment ratings for permanent anatomic and functional loss. Especially, the DWC and the Commissioner cannot avoid the law and cannot hide from being required to follow the law and to properly interpret, apply, and enforce the law as written by the Legislature.

## STATEMENT OF FACTS

Rosendo Morales, a Texas worker, suffered severe injuries on November 22, 2010 while in the course and scope of his employment with his employer,

Perry & Perry Builders, Inc.[1]   Texas Mutual Insurance Company provided workers compensation insurance as the Insurance Carrier on the date of the worker's injuries.[2]   It is undisputed that Mr. Morales sustained a compensable left shoulder contusion, left upper arm contusion, right heel contusion, right knee contusion, right knee meniscal tear and arthritis, neck contusion, and C5-6 radiculopathy on November 22, 2010.[3]   The parties stipulated that Claimant reached maximum medical improvement on the statutory date of December 26, 2012.[4]   Prior to reaching maximum medical improvement, Mr. Morales underwent a multi-level cervical spinal fusion fusing his cervical spine closed across four levels of his spine.   The DWC was asked to determine the proper impairment rating (and good cause for Texas Mutual missing the first scheduled hearing).[5]   The DWC hearing officer determined that neither the impairment rating was 13% with 8% other body parts and only 5% for the cervical spine and rejected the other impairment rating which had 8% for the other body parts and 27% for the fused cervical spine[6]  and the Insurance Carrier was ordered to pay workers' compensation

---

[1] CR 61 DWC Hearing Decision
[2] CR 61
[3] CR 61
[4] CR 62
[5] CR 58
[6] CR 61

benefits consistent with the decision.[7] The live pleadings of the Plaintiff are attached as Appendix 2, Plaintiff's First Amended Petition and Suit for Declaratory Judgment and Exhibit "A" DWC Contested Case Hearing Decision signed October 22, 2014, and DWC finality notice of January 27, 2014.

Rosendo Morales filed his lawsuit for declaratory judgment against the Insurance Carrier and the DWC and the DWC Commissioner.[8] The DWC also filed a plea to the jurisdiction asserting sovereign immunity.[9] Mr. Morales asked that the District Court declare his real rights to enforce the statute in compliance with statutory provisions which the DWC and the DWC Commissioner and the Insurance Carrier defendants who have not followed and not properly applied and properly enforced the Texas Labor Code provisions. [10]

The District Court granted the DWC and the Commissioner plea to the jurisdiction along with Texas Mutual's Plea to the jurisdiction.[11] This interlocutory appeal was brought by Rosendo Morales challenging the granting of the plea to the jurisdiction and dismissal of the DWC and the DWC Commissioner from this matter.

---

[7] CR 62

[8] CR 47 Plaintiff's 1st Amended Petition and Suit for Declaratory Judgment

[9] CR 60, 105

[10] CR 50-51

[11] CR 287,288

## SUMMARY OF THE ARGUMENT

A state agency which intervenes in a lawsuit may not be dismissed on jurisdictional grounds from the lawsuit it joined avoid being a necessary party to a statutory declaration lawsuit concerning the statutes the agency is charged to regulate and to enforce and to properly apply. Further, when the state agency acts beyond and in derogation of its statutory authority, the state official is a proper party to a lawsuit alleging such ultra vires acts under *Heinrich*. This is especially clear when administrative remedies have been exhausted. This Court of Appeals previously rejected the DWC and the Commissioner's argument that only judicial review between the parties is permissible:[12]

> The Division argues that because the carriers are permitted to seek judicial review of hearing decisions applying the advisories under section 410.251 of the labor code, they are barred from bringing declaratory judgment actions under the UDJA challenging the same decisions.

The 3rd Court rejected the DWC's similar arguments and concluded: "that the trial court had jurisdiction over the declaratory judgment action pursuant to the UDJA."[13] This matter is not different.

In this matter, Rosendo Morales has sought declaratory judgments that

---

[12] *Texas Dep. of Ins., Div. of Workers' Compensation v. Lumbermens Mut. Cas. Co.*, 212 S.W.3d 870, 874 (Tex App.—Austin 2006, *pet. denied*)
[13] *Lumbermens* at 875

assert the DWC Defendants and Commissioner and the Insurance Carrier have not properly interpreted, applied, and enforced the Texas Workers' Compensation Act under Texas Labor Code Provisions. Included in the declarations of law sought are the proper application, interpretation, and enforcement of TEXAS LABOR CODE. The legal resolution of the declarations will likely resolve the underlying administrative controversy where the material facts are not disputed. Without declarations, these legal questions will arise again and again and again. Workers' compensation system participants are entitled to a final declaration of, interpretation, and enforcement of the statutory terms by the Judicial Branch subject only to changes in the laws by the Texas Legislature.

Texas Courts are duty bound to properly construe statutory requirements especially where the Legislature's will is clearly ignored.

Here the DWC's and the Commissioner's position appears to be that it is only allowed to intervene under Texas Labor Code § 410.254, but that the DWC is somehow not a necessary or proper party in such suits enforcing the statutes which the DWC is required to enforce appears to create a dichotomy. This allows the DWC to continually misapply and misinterpret the law and act in violation of the law without being held accountable. The DWC and the

Commissioner's similar jurisdictional pleas arguing immunity from declaratory judgments were rejected by this Court of Appeals in 2006 in *DWC v. Lumbermens* and in 2013, last year, in the *Nat'l Ins. and DWC & Commissioner v. TPCIGA* decisions.[14]   The DWC and the Commissioner are clearly necessary to have the Texas Workers' Compensation Act and other applicable statutes properly applied in workers' compensation disputes concerning legal rights.

If the DWC and the Commissioner are correct, then the Judicial Branch of Texas government would lose its oversight of the Executive Branches proper application, proper interpretation, and proper enforcement of the laws adopted by the Texas Legislature and state agencies would be free to violate the very statutes which the agency and the state official is bound to uphold.

This case involves a justiciable controversy, properly exhausted administrative remedies, and clear questions of law concerning statutory interpretations, alleged statutory violations by the DWC and failure to properly apply the law.  The DWC and the Commissioner cannot avoid the law

---

[14] *Texas Dep. of Ins., Div. of Workers' Compensation v. Lumbermens Mut. Cas. Co.*, 212 S.W.3d 870 (Tex App.—Austin 2006, *pet. denied*); *Nat'l Am. Ins. Co. and TDI-DWC and Commissioner Bordelon in his official capacity v. Tex. Prop. & Cas. Ins. Guar. Ass'n*, No. 03-09-00680-CV, 2013 WL 4817637, 2013 Tex. App. LEXIS 10865 (Tex. App.--Austin Aug. 28, 2013, no pet.)

No. 03-14-00808-CV Rosendo Morales Appellant's Brief

and cannot hide from being required to follow the law when the state agency's actions violate the statutory requirements.

Appellant is not seeking damages from the state Defendants. Appellant is seeking to enforce the statutory rights violated by the Defendants.

## ARGUMENT & AUTHORITY

**Issue No. 1: Whether the District Court has jurisdiction to determine a declaratory judgment action brought to properly construe, interpret, and enforce applicable Texas statutes against the state agency and the head of the state agency after administrative remedies have been exhausted and a live controversy remains with allegations that the state defendants have violated the statutes in question by failing to properly apply the law?**

 1. **The District Court erred in Dismissing the DWC and the Commissioner.**

  The DWC and the Commissioner appear to allege declaratory relief is not available at all against the DWC and the Commissioner. Texas Mutual, in response to Plaintiff's Interrogatory No. 5 conceded: **"However, in the event the Court permits this declaratory judgment action to proceed, the DWC and its commissioner would be necessary parties."** All parties involved will be affected by the declaratory judgment action and to be of any force and effect, the UDJA unequivocally mandates:

> (a) When declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties. A declaration does not prejudice the rights of a person not a party to the proceeding.

TEX. CIV. P. & REM. CODE § 37.006. *See Brooks v. Northglen Ass'n,* 141 S.W.3d 158, 163 (Tex. 2004) (The Texas Supreme Court noted that no fault and no

10

prejudice lies with non-parties to the UDJA). The injured worker has properly

included the workers' compensation insurance carrier, and the Texas

Department of Insurance-Division of Workers' Compensation, DWC and the

Commissioner in this declaratory action.

A state agency may not avoid being a necessary party to a statutory

declaration lawsuit concerning the statutes the agency is charged to regulate,

to interpret, to apply, to adjudicate, and to enforce. This is especially clear

when administrative remedies have been exhausted and a live controversy

exists. The 3rd Court of Appeals previously rejected the DWC and the

Commissioner's argument that:[15]

> The Division argues that because the carriers are permitted to seek
> judicial review of hearing decisions applying the advisories under
> section 410.251 of the labor code, they are barred from bringing
> declaratory judgment actions under the UDJA challenging the same
> decisions.

The 3rd Court rejected the DWC's similar arguments and concluded: "that the

trial court had jurisdiction over the declaratory judgment action pursuant to

the UDJA."[16]

The Texas Supreme Court has held that the UDJA waives a municipality's

immunity against claims challenging the validity of its ordinances. *City of El*

---

[15] *Texas Dep. of Ins., Div. of Workers' Compensation v. Lumbermens Mut. Cas. Co.*,
212 S.W.3d 870, 874 (Tex. App.—Austin 2006, *pet. denied*)
[16] *Lumbermens* at 875

*Paso v. Heinrich*, 284 S.W.3d 366, 373 n.6 (Tex. 2009). The Court explained that that the governmental entity retains its immunity from suit when the claimant does not challenge the validity of a statute but rather challenges a government officer's application of a statute to the claimant. 284 S.W.3d at 372-73 & n.6. The affected parties remedy is an ultra vires suit against the government officer in his or her official capacity for prospective relief. *Id.* at 369-74. This would support DWC Commissioner being a party in this matter to properly apply the statutes in question and provide a valid interpretation and application and enforcement of statutes.

Contrast this matter with *Roal Global Corp. v. City of Dallas,* 2015 Tex. App. LEXIS 5205 (Tex. App. Dallas--May 21, 2015, no pet. h.); *City of McKinney v. Hank's Rest. Group, L.P.*, 412 S.W.3d 102, 112 (Tex. App.—Dallas 2013, no pet.); *Harvel v. Tex. Dep't of Ins.-Div. of Workers' Comp.*, 13-14-00095-CV, 2015 Tex. App. LEXIS 5159, 2015 WL 2452703 (Tex. App. Corpus Christi--May 21, 2015, motion for rehearing to be filed) (13th Court of Appeals determined sovereign immunity bars the claims against state agency and that a *Heinrich* challenge was not alleged.).

## 2. Declaratory Statutory Challenges Require State Agency to be a Party

Recent Texas Supreme Court cases also support that the state agency is a proper party in a declaratory action to determine parties' rights under the statute that the agency regulates and enforces especially where the state agency's violates the statutory terms. *Tex. Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 634-35 (Tex. 2010); *Tex. Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 859-60 (Tex. 2002); *Tex. Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex. 1994).

In *DeQueen* subsequent to *Heinrich*, the Texas Supreme Court reiterated that Declaratory Judgment Act suits to construe statutes are expressly allowed jurisdictionally against a state agency. *Texas Lottery Commission v. First State Bank of DeQueen*, 325 S.W.3d 628 (Tex. 2010). The DWC and the Commissioner are proper parties because without them the statutory legal questions and statutory application would not be applicable to the DWC and the Commissioner. The Supreme Court in *DeQueen* reiterated that jurisdiction over the state agency existed and citing to *Leeper* explained:

> [T]he DJA permits statutory challenges and governmental entities may be bound by those challenges, the DJA contemplates entities must be joined in those suits. *Leeper,* 893 S.W.2d at 446.

The Texas Supreme Court further explained in *DeQueen* that statutory

13

clarification, as expressly sought in this matter, that the state agency is a proper party:[17]

> Next, the Commission asserts that the DJA does not waive immunity because it applies only to suits involving constitutional invalidation and not to those involving statutory interpretation. But the language in the DJA does not make that distinction. In *Leeper*, . . . . **the DJA discussion was in the context of a statutory clarification. . . . . The decision on this claim may ultimately impact actions taken by officers of the Commission, but that does not deprive the trial court of jurisdiction.** [*Leeper*] at 445 (noting that the DJA allows courts to declare relief "whether or not further relief is or could be claimed"). The trial court properly exercised jurisdiction over this claim.

Subsequent to *DeQueen*, the Texas Supreme Court in *Sefzik* explained:[18]

> As noted, we dismissed Heinrich's claims seeking declaratory and injunctive relief against governmental entities, brought under the UDJA, because the entities were immune. In so doing, we necessarily concluded that the UDJA does not waive the state's sovereign immunity when the plaintiff seeks a declaration of his or her rights under a statute or other law. Very likely, the same claim could be brought against the appropriate state official under the ultra vires exception, but the state agency remains immune. *See id.* at 372-73. As we have consistently stated, the UDJA does not enlarge the trial court's jurisdiction but is "merely a procedural device for deciding cases already within a court's jurisdiction." *Tex. Parks & Wildlife Dep't v. Sawyer Trust,* 354 S.W.3d 384, 2011 Tex. LEXIS 640, *8 (2011) (quoting *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993)).

*Sefzik* would have allowed a claim for statutory rights enforcement and declaration to be brought as long as the appropriate state official be named— which the DWC Commissioner is named herein to cover the *Heinrich*

---

[17] *DeQueen*, 325 S.W.3d 628 at 635.

[18] *Tex. DOT v. Sefzik*, 355 S.W.3d 618, 621-622 (Tex. 2011).

determination where the state official is ignoring the law, the state official is a proper party.

**3. Under Labor Code Section 410.255, the DWC is a proper party for all other issues, which likely includes the Proper Enforcement of the Law for Assigning Impairment Ratings.**

If this declaratory judgment action is viewed properly as an issue beyond just entitlement to impairment rating income benefits, then Labor Code section 410.255 would require the DWC be made a party under a "substantial evidence review" standard. This Court of Appeals explained the two judicial review avenues under Chapter 410 of the Texas Labor Code:[19]

> Section 410.301 HN4 provides that suits "regarding compensability or eligibility for or the amount of income or death benefits" are governed by modified de novo review. Tex. Lab. Code Ann. § 410.301. Substantial-evidence review is reserved as the default for any other type of reviewable appeals panel decision. *See id.* § 410.255.

To anticipate the DWC's response that 410.255 would mandate venue in Travis County—such is not accurate because 410.252 controls judicial review and requires venue in the county of the worker's residence under either subchapter F (410.255) or subchapter G (410.301) of Chapter 410 of the Texas Labor Code. So even if Labor Code section 410.255 applies to network

---

[19] *Tex. Prop. & Cas. Guar. Ass'n v. Nat'l Am. Ins. Co.,* 208 S.W.3d 523, 533 (Tex. App.--Austin 2006, pet. denied).

No. 03-14-00808-CV Rosendo Morales Appellant's Brief

issues and then Texas Government Code section 2001.171 *et seq.* applies in this case (though such assertion is definitely contested), venue is still mandatory in Dallas County. Under Texas Government Code section 2001.176(b)(1) a petition must be filed in Travis County **"unless provided otherwise by statute."** Travis County is the default if the specific statute does not provide otherwise—here it provides local venue.

Texas Labor Code section 410.252(b)(1) statutorily mandates venue in the worker's county of residence (Dallas County) at the time of the injury. This is consistent with the administrative hearings in this matter being held in the local DWC field office within 75 miles of the worker's residence under Texas Labor Code section 410.005. Worth noting is section 410.252 precedes section 410.255, and both of these sections are part of Subchapter F of Chapter 410. Any attempt to say section 410.252 does not apply to section 410.255 would be contrary to the express language of the statute.

This Court of Appeals previously addressed whether the backup mandatory Travis County venue under the Guaranty Act controlled over the required mandatory county of an injured worker's residence under the Texas Workers' Compensation Act. See respectively, TEX. INS. CODE § 462.017(b) and TEX. LAB. CODE § 410.252(b). See TEX. LAB. CODE § 410.252(b)(1) (party

bringing suit must file petition in county where employee resided at time of injury); *Campos v. Texas Prop. & Cas. Ins. Guar. Ass'n,* 282 S.W.3d 226, 230 (Tex. App.—Austin 2009, no pet.). In *Campos v. TPCIGA*, this Court properly determined that the mandatory venue under Texas Labor Code §410.252(b)(1) the Texas Workers' Compensation Act trumped the conflict with the Insurance Code. This Court determined:[20]

> In our view, the specific venue provision of the Workers' Compensation Act controls over the general venue provision of the Guaranty Act.

The DWC is a proper party under Texas Labor Code Section 410.255.

### 4. Declaratory Relief is Proper & Needed When the DWC Misapplies the Law and Violates the Law.

The DWC and the Commissioner appear to allege declaratory relief is not available at all against the DWC and the Commissioner. All parties involved will be affected by the declaratory judgment action and to be of any force and effect, the UDJA unequivocally mandates:

> (a) When declaratory relief is sought, all persons who have or claim any interest that would be affected by the declaration must be made parties. A declaration does not prejudice the rights of a person not a party to the proceeding.

---

[20] *Campos v. Texas Prop. & Cas. Ins. Guar. Ass'n,* 282 S.W.3d 226, 231 (Tex. App.—Austin 2009, no pet.)

TEX. CIV. P. & REM. CODE § 37.006. *See Brooks v. Northglen Ass'n,* 141 S.W.3d 158, 163 (Tex. 2004) (The Texas Supreme Court noted that no fault and no prejudice lies with non-parties to the UDJA). If the Appellees, the DWC and the Commissioner, were not parties, then they would not be bound to follow the District Court's declarations.

**5. The DWC and Commissioner Previously Have Been Determined Proper Parties in UDJA Actions**

This Court of Appeals recently emphasized that a declaratory judgment action is allowed for Texas Labor Code proper statutory enforcement matters and are proper where a party "asked the court to declare its rights and status under certain statutory provisions" involving the Texas Workers' Compensation Act. *Nat'l Am. Ins. Co. and TDI-DWC and Commissioner Bordelon in his official capacity v. Tex. Prop. & Cas. Ins. Guar. Ass'n*, No. 03-09-00680-CV, 2013 WL 4817637, 2013 Tex. App. LEXIS 10865 (Tex. App.--Austin Aug. 28, 2013, no pet.) (mem. op.). This Court rejected the DWC's and the Commissioner's position that the trial court did not have jurisdiction to construe the statutes in issue and determined in part that "the trial court had jurisdiction to construe the statutes in issue." *Id.* The statutes in issue all were sections of the Texas Workers' Compensation Act under the Texas Labor

18

Code.   The parties were an insurance carrier, TPCIGA acting on behalf of an insurance carrier in receivership, and the DWC and the Commissioner.   This Court should also allow a declaratory judgment to proceed to enforce compliance with the statutory terms.  As the 3rd Court of Appeals explained in upholding the right to declaratory relief in the *Nat'l American* case:[21]

> A declaratory judgment action is proper only if a justiciable controversy exists as to the rights and status of the parties and the controversy will be resolved by the declaration sought. *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex. 1995).

A clear controversy exists with regards to the DWC and the Commissioner's proper application of the statutory requirements and that workers should have spinal fusion surgeries occurring before maximum medical improvement included in any assigned impairment ratings.

### 6. Insurance Carriers Are Allowed Declaratory Actions Against the TWCC and the DWC (now the DWC)—Why Not Injured Workers?

In 2003, this Court of Appeals allowed one insurance carrier to bring a declaratory judgment action against the injured worker and the Texas Workers' Compensation Commission, the predecessor to the DWC, after having exhausted administrative remedies was proper under the Uniform Declaratory Judgment Act.   *Tex. Workers' Compensation Ins. Fund v. Tex.*

---

[21] Id.

No. 03-14-00808-CV Rosendo Morales Appellant's Brief

*Workers' Compensation Comm'n & Watts*, 124 S.W.3d 813, 820 (Tex. App.--Austin 2003, *pet. denied*). This Court of Appeals in *TWCIF v. TWCC* allowed a declaratory action but agreed with the TWCC's statutory interpretation.

In 2006, this Court of Appeals in *Lumbermens* upheld the jurisdiction of the district court under the Uniform Declaratory Judgments Act, UDJA after an analogous matter arising out of a Chapter 410 proceeding. *Texas Dep. of Ins., Div. of Workers' Compensation v. Lumbermens Mut. Cas. Co.*, 212 S.W.3d 870 (Tex. App.—Austin 2006, *pet. denied*). The *Lumbermens* court stated:

> The UDJA does not confer jurisdiction on trial courts; rather, it is merely a procedural device for deciding cases already within a court's jurisdiction. . . .

> Accordingly, we hold that the trial court had jurisdiction under the UDJA and overrule the Division's second issue.

*Lumbermens* at 875. The authority clearly exists to use the UDJA, specifically §37.004, to pursue a declaration of statutory interpretation even when a rule violates the Texas Workers' Compensation Act for cases which administrative remedies have been exhausted under Chapter 410.

The 3rd Court in the *Lumbermens* case, *TWCIF v TWCC*, and the *Nat'l Amer. and TDI-DWC v. TPCIGA*, simply allowed and upheld declaratory judgments with the DWC as a proper party. In each case including the case decided last year, the DWC objected to the declaratory actions; however, the 3rd Court of

20

Appeals allowed each declaratory action to proceed and determined the meaning of the statutes in question. These three declaratory actions determined statutory rights in matters like this one arising after exhaustion of administrative remedies under Chapter 410 of the Texas Labor Code. This is a case challenging the state agency and the insurance carrier's improper application, interpretation, and lack of compliance and enforcement of state laws. When the Legislature declares a 6.25% state sales tax rate, a state agency could not try to declare and misapply a 7% state sales tax. When the Legislature declares complete and accurate and detailed written notice be provided to workers, a state agency and its official head cannot simply allow a website link to be provided.

The *TWCIF v. TWCC* and the *Lumbermens* cases were brought as a declaratory judgment action in conjunction with challenging a final decision from the Chapter 410 dispute process in the Texas Labor Code. Likewise, the *Nat'l Amer. v. TPCIGA* also was brought as a declaratory judgment action subsequent to a final Chapter 410 contested case hearing yet in a separate proceeding. These cases illustrate the need for an actual controversy and that Courts are allowed to address declaratory judgments on matters within their jurisdiction after administrative remedies have been exhausted. Unlike those

cases, the DWC intervened in this matter.

**7. The Predecessor to Texas Mutual, the Texas Workers' Compensation Insurance Fund, Pursued an Allowed Declaratory Action Against the TWCC and the DWC.**

In 2003, this Court of Appeals allowed one insurance carrier, the predecessor to Texas Mutual, to bring a declaratory judgment action against the injured worker and the Texas Workers' Compensation Commission, the predecessor to the DWC, after having exhausted administrative remedies in a dispute against one worker and that such was allowed under the Uniform Declaratory Judgment Act. *Tex. Workers' Compensation Ins. Fund v. Tex. Workers' Compensation Comm'n & Watts*, 124 S.W.3d 813, 820 (Tex. App.--Austin 2003, *pet. denied*). The 3rd Court of Appeals in *TWCIF v. TWCC* allowed a declaratory action but agreed with the TWCC's statutory interpretation. This Court properly determined the legal dispute over the meaning of an "issue," as used in Tex. Lab. Code §410.204(a), refers to the disputed determinations made by the hearing officer in rendering the final decision. Clearly, the state agency was a necessary party to the declaratory action.

Texas Mutual has sought declaratory judgments under the Texas Workers' Compensation Act in other matters in which Texas Mutual won the declaration, and this Court of Appeals determined the DWC's plea to the

22

jurisdiction was granted in error. *Texas Mutual Insurance Co. v. Texas Department of Insurance, Division of Workers' Compensation,* 214 S.W.3d 613 (Tex. App.--Austin 2006, no pet.).

Texas Mutual and the DWC (its predecessor the TWCC) successfully sought declaratory judgments against a chiropractor for the proper application of the Texas Labor Code (the Texas Workers' Compensation Act). *Howell v. TWCC & Texas Mutual,* 143 S.W.3d 416, 429 (Tex. App. --Austin 2004, pet. denied). , and this Court of Appeals explained:

> Unlike an advisory opinion, these declarations did not concern hypothetical claims or abstract questions of law. The declarations went to the heart of the controversy between the parties. . . . A trial court has the discretion to enter a declaratory judgment as long as it will serve a useful purpose or will terminate the controversy between the parties.

In prior legal brief, **2006 TX App. Ct. Briefs LEXIS 276** , Texas Mutual successfully asserted a need for declaratory judgment relief against the DWC. *Tex. Mut. Ins. Co. v. Tex. Dept. of Ins., Div. of Workers' Compensation*, 214 S.W.3d 613, 619 (Tex. App.—Austin 2006, no pet.) Texas Mutual argued entitlement to a declaration and that the attached final DWC contested case hearing officer's decision confirmed this (emphasis added):

> First, the attached decision confirms that Texas Mutual's declaratory judgment action challenging the validity of Rule 110.1 is ripe. Texas Mutual seeks declaratory judgment that the Rule cannot validly extend a

23

policy past the date that the statute would require. . . .

Texas Mutual is entitled to appeal the attached decision. TEX. LABOR CODE § 410.252. But that potential appeal is not the exclusive remedy available to Texas Mutual. **Only by a declaratory judgment action such as the one in the case at bar** can Texas Mutual **resolve the scope of the Division's statutory authority** over cancellation, non-renewal, and offers of renewal not accepted. **The declaratory judgment action would thus be proper even if there were also an APA appeal of a particular order**

## 8. Prior Declaratory Judgment over Impairment Ratings and *AMA Guides*

In 2006, this Court of Appeals in *Lumbermens* upheld the jurisdiction of the district court under the Uniform Declaratory Judgments Act, UDJA, after an analogous matter arising out of a Chapter 410 proceeding. *Texas Dep. of Ins., Div. of Workers' Compensation v. Lumbermens Mut. Cas. Co.*, 212 S.W.3d 870 (Tex. App.—Austin 2006, *pet. denied*). The *Lumbermens* court stated:

The UDJA does not confer jurisdiction on trial courts; rather, it is merely a procedural device for deciding cases already within a court's jurisdiction. . . .

Accordingly, we hold that the trial court had jurisdiction under the UDJA and overrule the Division's second issue.

*Lumbermens* at 875. The authority clearly exists to use the UDJA, specifically §37.004, to pursue a declaration of statutory interpretation even when a rule or mere agency position violates the Texas Workers' Compensation Act.

Mr. Morales has in part requested a declaratory judgment ruling that spine impairment ratings under the Texas Workers' Compensation Act must take into consideration spinal surgeries and the effects of spinal surgeries when the surgeries occur prior to maximum medical improvement, MMI, being reached. This legal question of whether spinal surgery occurring before MMI must be considered in assigning an impairment rating was expressly left open by this Court in *Severiano DeLeon v. Royal Indemnity Company,* 396 S.W.3d 597 (Tex. App.--Austin 2010) rev'd on other grounds *Severiano DeLeon v. Royal Indem. Co.,* 396 S.W.3d 527 (Tex. 2012).

9. ***Lumbermens* Was Wrong to Try to Exclude Consideration of Pre-MMI Spinal Surgeries as the *DeLeon* decision determined that Pre-MMI Spinal Surgeries Question Would Be Left Open.**

Insurance Carriers and the DWC and the DWC Commissioner have used the *Lumbermens dicta* inappropriately to try to exclude all spinal surgeries, even pre-MMI, from consideration (and this is evidently taught to a number of designated doctors).[22] Subsequent to *Lumbermens*, this Court's *DeLeon* decision expressly distanced itself from this *dicta,* with this Court noting that it would leave open and not reach Mr. DeLeon's arguments including

---

[22] *Tex. Dep't of Ins. v. Lumbermens Mut. Cas. Co.,* 212 S.W.3d 870 (Tex. App.—Austin 2006, *pet. denied*)

No. 03-14-00808-CV Rosendo Morales Appellant's Brief

considering pre-MMI surgery, this Court stated: [23]

> **Therefore, we need not reach the issue of whether pre-MMI surgery may be taken into account under the *AMA Guides* when assessing an impairment rating for a spine impairment.**

A major flaw from allowing the DWC and insurance carriers to apply the dicta from the *Lumbermens* decision was created in part because no worker was in that appeal to point out the pertinent provisions of the *AMA Guides*, was from looking at one sentence of the *AMA Guides* in isolation and not with respect to Table 70 which provides express "specific disorder" categories for "previous spine operations," the MMI date, or even the definition of "impairment" under the WC Act. *Attached* as Appendix No. 3 are the applicable pages from the AMA Guides to the Evaluation of Permanent Impairment, 4th Edition, which is allowed to be used by the Legislature under Texas Labor Code Section 408.124(c).

Under Table 70, Mr. Morales is entitled to a range of categories, and, as discussed below, the Range of Motion model should be used if Table 70 does not contain a specific rating.

The line taken out of context from the AMA Guides in the *Lumbermens* decision to somehow, and somewhat inexplicably, exclude spinal fusion

---

[23] *Severiano DeLeon v. Royal Indemnity Company,* 396 S.W.3d 597 (Tex. App.--Austin 2010) rev'd on other grounds *Severiano DeLeon v. Royal Indem. Co.,* 396 S.W.3d 527 (Tex. 2012)

surgeries from impairment ratings is:

> With the Injury Model, surgery to treat an **impairment** does not modify the **original impairment estimate**, which remains the same in spite of any improvement or failure to improve with regards to symptoms that follow the surgery and irrespective of whether the patient has a favorable or unfavorable response to treatment. [*Emphasis added*, AMA Guides, p. 100, left column, paragraph 3].

Under Texas Labor Code Sections 401.011(23) & (24) the Legislature's definitions are as follows:

> (23) "Impairment" means any anatomic or functional abnormality or loss existing *after maximum medical improvement* that results from a compensable injury *and* is reasonably presumed to be *permanent*.
> (24) "Impairment rating" means the percentage of *permanent impairment* of the whole body resulting from a compensable injury.

The "impairment" must be from an examination done after MMI has been reached and be based upon the doctor's evaluation of the injured worker's condition after MMI. [24]   So surgery occurring after MMI, at least under the law, would not affect the original impairment rating, but surgery occurring before an impairment is reached is certainly included.

In the *Molder* decision, the El Paso Court properly emphasized that MMI must be reached before an impairment rating may be evaluated, and the impairment rating is based on the employee's *condition* as of the date of MMI. In *Molder*, the Court of Appeals explained DWC Rule 130.1 and left the

---

[24] TEX. LAB. CODE § 408.123(a).

medical judgment to the doctor to include the surgery (emphasis added):[25]

> Rule 130.1(c)(3) requires that assignment of an impairment rating for the current compensable injury be based on the injured employee's condition as of the MMI date considering the medical record and the certifying examination. 28 Tex. Admin. Code § 130.1(c)(3). . . .

An "impairment" is permanent and not determined until **after** MMI is reached and clearly not the same as an "injury" under the *AMA Guides*. Surgery to treat an "impairment" is legally different from surgery to treat an "injury."  In discussing the impact of surgery with regards to MMI,  the DWC Appeals Panel explained in DWC Appeals Panel Decision No. 080375, May 15, 2008, 2008 WL 2233469:

> 28 TEX. ADMIN. CODE § 130.1(c)(3) (Rule 130.1(c)(3)) provides that the assignment of an IR for the current compensable injury shall be based on the injured employee's condition as of the MMI date considering the medical record and the certifying examination. . . . In response to public comment on Rule 130.1, the Division, in the preamble, noted that in the situations where the claimant reaches MMI clinically, rather than with the expiration of 104 weeks or the extended date in the event of spinal surgery, future changes in the injured worker's condition may cause the MMI date to change and that "[i]n the event the MMI date is changed due to a post-MMI change in the injured employee's conditions, there should be a re-evaluation of the IR as of the new MMI date."

---

[25] *Tex. Builders Ins. Co. v. Molder,* 311 S.W.3d 513 (Tex. App. El Paso 2009, *no pet.*)

Surgery after MMI perhaps does not legally affect the impairment rating, but certainly pre-MMI surgery does. In this matter, Mr. Morales had a multi-level pre-MMI fusion surgery to treat his "injury" not surgery to treat his "impairment," which would refer to his post-MMI and post-surgery permanent condition. The Arkansas Workers' Compensation Commission properly explained such in an administrative decision:

> . . . a single level fusion was not geared to treat an **impairment**, but rather an **injury**, a recurrent herniated nucleus pulposus lumbar 4-5 right.

*Camp v. Greene County Tech. et. al*, decided October 17, 2008, 2008 WL 4686198 (Ark.Work.Comp.Com.)(allowing rating after and considering surgery but under Arkansas law apportioning out prior impairments). The no inclusion of multi-level fusion surgery by the designated doctor results from the erroneous interpretation applied from *Lumbermens* and clearly left open in *DeLeon* likely because such misinterpretation violates and contradicts the *AMA Guides* requirements, DWC rules, and the WC Act.

Further under the Range of Motion model used by the physician to rate the multi-level fusion of Mr. Morales, the *AMA Guides* expressly provide for ratings of surgical fusions when Table 70 cannot be used or to help decide a category under Table 75 of the AMA Guides, which starts with a 10% rating

29

for a one level cervical fusion—the DWC's designated doctor here only assigned a 5% rating for the cervical spine, when Mr. Morales undisputed underwent a four level cervical fusion. The DWC's enforced rating is clearly erroneous and legally invalid.

## 10. The DWC and the Commissioner Relied Below on Inapplicable and Distinguishable Decisions

The Appellees relied upon easily distinguishable cases. In the District Court, the Appellees relied in part upon *Beacon Nat 'I Ins. Co. v. Montemayor*, 86 S.W.3d 260, 267 (Tex. App.-Austin 2002, no pet.). In *Beacon v. Montemayor*, the 3rd Court of Appeals explained:

> The UDJA waives this immunity when a party seeks a court's construction of a statute or rule. *City of LaPorte v. Barfield*, 898 S.W.2d 288, 297, 38 Tex. Sup. Ct. J. 533 (Tex. 1995). Beacon's action does not seek construction of a statute or rule; . . . .

This shows that the party seeking the declaration in *Beacon* did not seek proper statutory construction or clarification unlike the declaratory requests here.

Further, the Appellees below cited to *Kuntz v. Khan*, No. 03-10-00 160-CV, 2011 Tex. App. LEXIS 446, 2011 WL 182882,(Tex. App.--Austin 2011, no pet.)(mem. op.). *Kuntz v. Khan* rejected a declaratory judgment because "the effect of a favorable ruling in either lawsuit would be the same—if Khan

prevails in either suit, the result would be a determination that the Department has no authority to regulate eyebrow threading." *Kuntz v Khan* addressed a suit directly against and enforceable against the state agency versus here where the DWC and the Commissioner are not necessary parties to a judicial review action under Chapter 410.301 without the legal declaratory relief sought.

Likewise the DWC below relied upon *Young Chevrolet, Inc. v. Tex. Motor Vehicle Bd.*, 974 S.W.2d 906,911 (Tex. App.--Austin 1998, pet. denied), which also involved direct actions against the state regulatory agency as a party creating enforceability against the agency without the need for a declaration. The DWC and DWC Commissioner are not parties to mere judicial review actions under Texas Labor Code Section 410.301-302.

*Kuntz v Khan* and other cases involving direct judicial challenges to a state agency are in direct contrast here where the DWC is not a mandatory party under Chapter 410 disputes except under Section 410.255, and the only method to enforce proper statutory construction and enforcement against the DWC and the Commissioner is, simply and legally, to make the DWC and the Commissioner a party, in fact a necessary party for legal declarations of statutory meanings, rights, applications, and proper enforcement especially

31

where violations of the law are alleged.

To bind the regulatory state agency, the DWC and the Commissioner, in his official capacity, are necessary and proper parties when declaratory relief is sought to ensure compliance and that state officials do not act *ultra vires.*

**11.    The District Court Has Jurisdiction over all the Claims**

The Appellant has exhausted his administrative remedies before the DWC and the Commissioner with an unfavorable ruling based upon statutory construction and misapplication and refusal to comply with the law by the Appellees.   When reviewing a plea to the jurisdiction, the pleadings are construed in favor of the non-movant. *See Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex.2004); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 446 (Tex. 1993). "The general test for standing in Texas requires that there (a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought." *Tex. Ass'n of Bus.*, 852 S.W.2d at 446.

To prevail, the party asserting the plea to the jurisdiction must show that even if all the allegations in the plaintiff's pleadings are taken as true, there is an incurable jurisdictional defect apparent from the face of the pleadings, rendering it impossible for the non-movant's claims to confer

32

jurisdiction on the trial court. *Texas State Employees Union/CWA Local 6184 v. Texas Workforce Comm'n,* 16 S.W.3d 61, 65 (Tex. App.-Austin 2000, *no pet.*). A court deciding a plea to the jurisdiction is not required to look solely to the pleadings, but may consider evidence relevant to the jurisdictional issue and must do so when necessary to resolve the jurisdictional issues which have been raised. *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554-55 (Tex. 2000). A court should construe the pleadings in the non-movant's favor and look to the non-movant's intent. *Texas Ass'n of Business v. Texas Air Control Bd.,* 852 S.W.2d 440 at 446 (Tex. 1993). A court does not address the merits of the case in a plea to the jurisdiction; instead, the movant must establish why the merits of the non-movant's claims should not be reached. *Bland Indep. Sch. Dist.,* 34 S.W.3d *at* 554. The DWC and the Commissioner have not shown that an injured worker's suit to properly enforce compliance with statutory terms falls outside the jurisdiction of the District Court because administrative remedies have been exhausted, and the pleadings illustrate why the DWC and the Commissioner must be parties to be able to enforce any declarations against the state agency and its administrative head when the agency fails to properly follow the Legislature's laws and acts in violation of the state laws.

**12.      Resolution of the Controversy with Declaratory Action**

The judicial declaration sought by Rosendo Morales will help determine and likely resolve the underlying controversy concerning the proper inclusion of spinal fusion surgeries in the impairment ratings assigned to injured workers.

## 13.     Texas Courts are "Duty-Bound" to Construe Statutes

Texas District Courts are inherently vested with the power to construe statutes, and Courts are not bound by an agencies interpretation or application, especially if in error. If a declaratory judgment action terminates the uncertainty or controversy giving rise to the lawsuit, the District Court is duty-bound to declare the rights of the parties as to the matters on which the parties join issue. *Spawglass Constr. Corp. v. City of Houston*, 974 S.W.2d 876, 878 (Tex. App.--Houston [14th Dist.] 1998, pet. denied); *Calvert v. Employees Ret. Sys. of Tex.*, 648 S.W.2d 418, 419 (Tex. App.--Austin 1983, writ ref'd n.r.e.). Without the DWC and the Commissioner, the enforcement of the statutes proper application would not be available to a judge.

## 14.     Live Justiciable Controversy Exists

Appellant also has clearly asserted that the DWC and the Commissioner

interpretation and application of the laws in question violate the statutes of Texas and the statutory responsibility, authority and limits placed upon the DWC and the Commissioner and that statutory interpretation and validity of application of the Texas Workers' Compensation Act are in dispute. A justiciable controversy regarding whether a state agency or officer has acted beyond statutory authority provides a jurisdictional basis for a UDJA action seeking construction of that statutory authority. This type of UDJA action does not implicate sovereign immunity. *Cobb v. Harrington*, 144 Tex. 360, 190 S.W.2d 709, 712 (1945); *see also Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 855 (Tex. 2002) ("Private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority."). A suit for declaratory relief is not a suit against the State because it does not seek to impose liability or money damages against the state agency. *IT-Davy,* 74 S.W.3d at 853.

## 15. Declaratory Actions Allowed Even After Prior Final Judgments under Chapter 410 of the Texas Labor Code to Determine Statutory Rights

This Court of Appeals recently allowed a declaratory judgment action against the DWC, the Commissioner, and an insurance carrier to determine statutory rights after a previous final judgment under a Texas Labor Code

Chapter 410 dispute.    *Nat'l Am. Ins. Co. v. Tex. Prop. & Cas. Ins. Guar. Ass'n for Paula Ins. Co.,* 2013 Tex. App. LEXIS 10865 (Tex. App.--Austin Aug. 28, 2013, no pet.).  This Court, in allowing the declaratory action to proceed, explained that it was not a collateral attack on the prior judgment because: "the controversy underlying the Guaranty Association's declaratory judgment action concerns NAIC's rights vis-a-vis the Guaranty Association under section 410.033 of the Labor Code and the Guaranty Act.   The declaratory judgment action regarding reimbursement thus involves the existence of a statutory right . . . ."    Clearly, declaratory actions over statutory rights and the proper enforcement of those rights under the Labor Code and the Code of Criminal Procedure are allowed where, as here, a live controversy exists and administrative remedies have been exhausted.

Further, the state agency is a necessary party when the authority of the state agency's actions and rules are questioned as violating the will of the Legislature.  The DWC and the Commissioner being joined in this matter makes this declaratory action proper so as to be enforced against the DWC and the Commissioner to not violate the statutes.   This Court previously explained:

**The UDJA grants any litigant whose rights are affected by a statute the**

**opportunity to obtain a declaration of those rights under the statute and requires that all relevant parties be joined in any declaratory judgment suit**. Tex. Civ. Prac. & Rem. Code Ann. §§ 37.004, .006 (West 1997); City of Waco v. Texas Nat. Res. Comm'n, 83 S.W.3d 169, 179 (Tex. App.-Austin 2002, pet. denied) (UDJA claim not barred by sovereign immunity because UDJA serves to clarify rights already guaranteed by legislature). Therefore, **when the State is a necessary party to a statutory cause of action, such as a UDJA action for interpretation of a statute, sovereign immunity is expressly waived because, were the State not joined, the right to a declaration would have no practical effect.** *See City of La Porte v. Barfield*, 898 S.W.2d 288, 297 (Tex.1995) (*construing Texas Educ. Agency v. Leeper*, 893 S.W.2d 432, 446 (Tex.1994)); *see also Beacon Nat'l Ins. Co. v. Montemayor*, 86 S.W.3d 260, 267 (Tex. App.--Austin 2002, no pet.) ("The UDJA waives [sovereign] immunity when a party seeks a court's construction of a statute or rule."); Star Houston v. Texas Dep't of Transp., 957 S.W.2d 102, 111 (Tex. App.--Austin 1997, pet. denied) (holding that sovereign immunity did not bar declaratory judgment determining whether agency has wrongfully construed a statute); City of Austin, 728 S.W.2d at 910-11 (holding UDJA action brought against government entity to determine scope of entity's authority not barred by sovereign immunity). **A UDJA action exists whether or not further relief can be obtained.** *Leeper,* 893 S.W.2d at 446. Thus, when a party brings a declaratory judgment action to interpret an agency's statutory authority, immunity from suit is waived by the UDJA. This does not mean, however, that immunity from damages is waived except as to a declaration of the parties' rights and the potential award of attorney's fees. UDJA actions for statutory interpretation do not implicate the policy concerns of protecting the legislature's policy-making discretion and avoiding raids on the public treasury embodied in the sovereign immunity doctrine-rather, they serve to clarify the rules and requirements imposed by the legislature on the administrative agencies.

(Emphasis added.) *Texas Mun. Power Agency v. Public Utility Com'n,* 100

S.W.3d 510, 515-516 (Tex. App.--Austin 2003, *pet. denied*) (*cited to favorably*

*by Texas Mun. Power Agency v. Public Utility Com'n of Texas,* 253 S.W.3d 184,

189 (Tex. 2007). Appellant does not seek damages from the DWC or the Commissioner, but does seek to clarify and to enforce the proper compliance with the statutory requirements on the administrative agency and its head official who are violating the law. The DWC should not be allowed to continue to improperly interpret and fail to enforce the Texas Labor Code.

### 16. Declaratory Actions under the Texas Workers' Compensation Act

The initial challenge to the 1989 Texas Workers' Compensation Act in *Garcia* was primarily a declaratory judgment action.[26] The Texas Supreme Court reiterated as to the declaratory action against the then TWCC and the Executive Director looking at the terms and Constitutionality of the 1989 Act:[27]

> Standing, which is a necessary component of subject matter jurisdiction, requires a) a real controversy between the parties, which b) will be actually determined by the judicial declaration sought.

The DWC and the Commissioner's actions ignore the statutory requirements to be applied against insurance carriers and employers and in favor of workers and health care providers.

---

[26] *Texas Workers' Compensation Commission v. Garcia, 893 S.W.2d 504, 517-518 (Tex. 1995).*
[27] *Garcia at* 513.

No. 03-14-00808-CV Rosendo Morales Appellant's Brief

Appellant has exhausted all applicable administrative remedies under Chapter 410 of the Texas Labor Code. A UDJA claim is *sui generis*; and, all other things being equal, the district court's subject matter jurisdiction over it exists independently of any administrative remedies. *Texas Liquor Control Bd. v. Canyon Creek Land Corp.,* 456 S.W.2d 891, 895 (Tex.1970); *Cobb,* 190 S.W.2d at 713; see *Texas Mun. Power Agency v. Public Util. Comm'n*, 100 S.W.3d 510, 520 (Tex. App.--Austin 2003, *pet. denied*). Even if the UDJA claims in this matter could not be brought independently, the claims certainly could be brought within the jurisdiction created by the exhausted administrative dispute.

The Third Court of Appeals in *Mid-Century Insurance Company v. Texas Workers' Compensation Commission,* 187 S.W.3d 754 (Tex. App.—Austin 2006, *no pet.*), determined that a rule exceeded the statutory authority of the DWC and noted that:

> Mid-Century Insurance Company (Mid-Century) sought a declaration that this rule exceeds the Division's statutory powers and is thus invalid. *See* Tex. Civ. Prac. & Rem. Code Ann. § 37.004 (West 1997).

*Id. at* 756. Without declaratory actions, the statutes could be ignored by the DWC and the Commissioner with enforcement only on a piece-meal basis by litigants who are able to challenge improper agency actions.

Whether the District Court, or any Court, ultimately rules in Appellant's favor or not—the District Court certainly can declare rights of the interested parties, an injured worker and an insurance carrier, directly affected by the applicable state agency and agency head, under the statutes as a matter of law especially where administrative remedies have been exhausted. *See Tex. Workers' Compensation Ins. Fund v. Tex. Workers' Compensation Comm'n,* 124 S.W.3d 813 (Tex. App.--Austin 2003, *pet. denied*).

### 17. ENFORCABILITY: UDJA is Especially Necessary where the DWC Refuses to Recognize Chapter 410 District Court Rulings as Legally Binding

The DWC's position on individual Chapter 410 judicial review cases is that mere district court reversals of a final DWC decision under Chapter 410 of the Texas Labor Code are not binding as to the DWC's interpretation even if it is improper as to any other case. The DWC Appeals Panel has reiterated:[28]

> that the decision of a [city 1] District Court had no effect "beyond its factual context" and did not bind the Texas Workers' Compensation Commission (Commission) as a matter of *stare decisis* in the Commission's interpretation of the 1989 Act.

This shows the Catch-22 that the DWC places all parties under that the DWC and Commissioner's disregard for a court decision beyond "its factual content"

---

[28] DWC APPEAL NO. 050140, 2005 TX Wrk. Comp. LEXIS 57 (decided March 14, 2005)

unless, as here, the DWC and Commissioner are made parties or intervene. This matter is of significant public importance and concerns the very line drawn as to the entry into course and scope of employment by Texas peace officers.

Only after the appellate decision upholding declaratory judgment in *Lumbermens* become final did the DWC Appeals Panel follow the declaration:[29]

> Lumbermens Mutual Casualty Company filed suit against the Division seeking in part a declaratory judgment that the Advisories are inconsistent with *28 TEX. ADMIN. CODE § 130.1* (Rule 130.1) and that their issuance and application is outside the Division's statutory authority.
>
> The Advisories have been declared invalid and their application an *ultra vires* act. *Lumbermens, supra.* Therefore, the adoption of an IR that is based on the Advisories is legal error and must be reversed. Prior Appeals Panel decisions applying the Advisories to rate impairment for spinal fusion surgery have been overruled by the *Lumbermens* case.

The DWC will follow a declaratory judgment as to statutory rights and its prior errors, but will not apply a District Court's reversal of a single workers' compensation dispute decision beyond the single workers' compensation claim. The DWC's own decisions signify why declaratory judgments are allowed and clearly necessary in this matter.

---

[29] DWC Appeals Panel No. 071023-s, decided July 23, 2007, 2007 TX Wrk. Comp. LEXIS 54.

Here are several more final DWC decisions from over the years refusing to follow the law in District Court cases:

(1)      DWC APPEAL NO. 94994, 1994 TX Wrk. Comp. LEXIS 6081, September 9, 1994: "... **nor is the Commission joined as a party.** The decision is without effect, therefore, beyond its factual context, **and certainly the Commission is not bound by such a general judgment of a district court,** through *stare decisis*, in its interpretation of the Section 409.021." (Emphasis added.)

(2)      DWC APPEAL NO. 951802, 1995 TX Wrk. Comp. LEXIS 4964, December 13, 1995, emphasizing: "We do not consider the Appeals Panel bound by this district court opinion in a case involving other parties and in which the commission did not participate."

(3)      DWC Appeal No. 990005, 1999 TX Wrk. Comp. LEXIS 3029, decided February 19, 1999: "The Appeals Panel **is not bound by a district court opinion in a case involving other parties and in which the Commission did not participate.** Texas Workers' Compensation Commission Appeal No 94994, decided September 9, 1994." (Emphasis added.)

The DWC and the Commissioner should be a party to a proceeding in which legal determinations are sought to bind the DWC and the Commissioner to follow the law. This underlying legal questions have not been declared and determined and are not yet up on appeal, but the declarations sought under the statutes are critical to resolving this matter.

### 18. Declaratory Judgment Prevents Continued Erroneous Statutory Interpretation by the DWC and the Commissioner

In the workers' compensation area, after final administrative decisions as here, both insurance carriers and injured workers' have sought declaratory rulings concerning the validity and applicability of the DWC and the Commissioner statutes and rules. *See Mid-Century, supra*; *Fulton v. Associated Indemnity Company,* 46 S.W.3d 364 (Tex. App—Austin 2002, *pet. denied*); *Houston General Insurance Co. v. Association Casualty Insurance Co.,* 977 S.W.2d 634 (Tex. App.—Tyler, *no pet.*). Venue of the main action shall establish venue of a counterclaim, cross claim, or third-party claim properly joined under the Texas Rules of Civil Procedure or any applicable statute. TEX. CIV. PRAC. & REM. CODE §5.062(a); *Howell v. Texas Workers' Compensation Com'n,* 143 S.W.3d 416, 433 (Tex. App.--Austin 2004, *pet. denied*). A declaratory judgment simply declares the rights, status, or other legal relations of the parties; and under Tex. Civ. Prac. & Rem. Code §37.003(a), (b),

a trial court has the "power to declare rights, status, and other legal relations whether or not further relief is or could be claimed," and declaration has the "force and effect of a final judgment or decree". *Howell at* 432. Without the DWC and the Commissioner present, Appellant's pleadings and claims for relief would have little effect if not arguably result in an inability to be enforced against the DWC and the Commissioner at all if in fact the DWC and the Commissioner are not a party.

## CONCLUSION

This Court should allow Rosendo Morales to proceed with the declaratory judgment claim and keep as parties both the DWC and the Commissioner, in his official capacity. The jurisdiction exists due to the live controversy, exhaustion of administrative remedies, and the state agency and state official are necessary parties for proper enforceability of the statutes and to ensure proper compliance with statutory terms alleged to be violated. Otherwise only the few who continue to fight will have a chance for justice on a piece by piece basis and the harm may occur again and again. The purpose of the Declaratory Judgment Act is to make the laws clear to all affected and to make sure the laws are properly applied and not violated by the state agency and the head of the state agency. The Judiciary oversees the Executive Branch

both to uphold its proper actions but to also to protect Texans' rights to make sure the laws are properly applied and correctly interpreted and rightly enforced.

## PRAYER

Rosendo Morales, Appellant, respectfully prays and ask that this Court reverse the ruling of the District Court on the plea to the jurisdiction granted to the DWC and the Commissioner, and this Court should not allow the dismissal of the DWC and the Commissioner, and that this Court determine that the District Court has jurisdiction to determine the declaratory judgment matters sought by Appellant including against the DWC and the Commissioner. Appellant ask for all other relief to which he is entitled including costs of court.

Respectfully,
/s/ Brad McClellan
Bradley Dean McClellan
State Bar No. 13395980
Of Counsel, Law Offices of Richard Pena, P.C.
Richard Pena
Law Offices of Richard Pena, P.C
State Bar No. 00000073
1701 Directors Blvd., Suite 110
Austin, Texas 78744
Brad.McClellan@yahoo.com
(512) 327-6884 telephone
(512) 327-8354 facsimile
Attorney for Appellant

## CERTIFICATE OF COMPLIANCE

I certify that I have 10,480 word count checked by the word program in compliance with the Texas Rules of Appellate Procedure.

/s/ Brad McClellan
Bradley Dean McClellan

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Appellants' Brief was served on the through counsel of record by the method indicated below on May 27, 2015.

| | |
|---|---|
| Adrienne Butcher, Assistant Attorney General | *Via efiling/eservice* |
| Administrative Law Division | |
| Office of the Attorney General of Texas | |
| P.O. Box 12548 (MC-018), Capital Station | |
| Austin, Texas 78711-2548 | |
| 512-475-4208 | |
| Facsimile: (512) 320-0167 | |
| adrienne.butcher@texasattorneygeneral.gov | |
| Attorneys for DWC and Commissioner | |

| | |
|---|---|
| Courtesy copy provided to other Defendant below | *Via efiling/eservice* |
| Scott Placek & Matthew Foerster | |
| Arnold & Placek, LLC | |
| 203 East Main Ave, Ste. 203 | |
| Round Rock, TX 78664 | |
| Attorneys for Defendant | |

/s/ Brad McClellan
Bradley Dean McClellan

APPENDIX

1.  Order Granting Plea to the Jurisdiction of the DWC

2.  First Amended Petition and Suit for Declaratory Judgment including the Final DWC Decision and Order

3.  *AMA Guides* Sections for Spine Impairments

## CAUSE NO. 269,135-B

| | | |
|---|---|---|
| ROSENDO MORALES,<br>  *Plaintiff,* | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | |
| v. | § | |
| | § | |
| TEXAS MUTUAL INSURANCE | § | |
| COMPANY, | § | |
|   *Defendant,* | § | BELL COUNTY, TEXAS |
| & | § | |
| | § | |
| TEXAS DEPARTMENT OF INSURANCE- | § | |
| DIVISION OF WORKERS' | § | |
| COMPENSATION and COMMISSIONER | § | |
| ROD BORDELON, IN HIS OFFICIAL | § | |
| CAPACITY, | § | |
|   *Defendants.* | § | 146TH JUDICIAL DISTRICT |

### ORDER

On November 21, 2014, the parties in the above-referenced case appeared before the Court for a hearing on Defendants Division of Workers' Compensation and Commissioner Rod Bordelon's Plea to the Jurisdiction, filed July 29, 2014. After considering the parties' arguments, the applicable law, and the pleadings and record in this case, the Court finds that Defendants Division of Workers' Compensation and Commissioner Rod Bordelon's Plea to the Jurisdiction is meritorious and should be granted.

Accordingly, the Court GRANTS Defendants Division of Workers' Compensation and Commissioner Rod Bordelon's Plea to the Jurisdiction. Defendants Division of Workers' Compensation and Commissioner Rod Bordelon are hereby DISMISSED from this case, and all requested relief against them is DENIED.

_____
PRESIDING JUDGE

SCAN
12-15-14

287


Filed 5/22/2014 2:19:08 PM
Shelia Norman, District Clerk
District Court – Bell County, TX
Deputy
Lacey Martindale



**CAUSE NO. 269,135-B**

| | | |
|---|---|---|
| ROSENDO MORALES, | § | IN THE DISTRICT COURT |
| Plaintiff | § | |
| V. | § | |
| | § | |
| TEXAS MUTUAL INSURANCE CO., | § | BELL COUNTY, TEXAS |
| Defendant | § | |
| & | § | |
| Texas Department of Insurance-Division of | § | |
| Workers' Compensation and Commissioner | § | |
| Rod Bordelon, in his official capacity, | § | |
| Defendants | § | 146th JUDICIAL DISTRICT |

## PLAINTIFF'S FIRST AMENDED PETITION, REQUEST FOR DECLARATORY JUDGMENT & REQUEST FOR DISCLOSURE

PLAINTIFF, ROSENDO MORALES, in the above-entitled and numbered cause, files this Plaintiff's First Amended Petition, Request for Declaratory Judgment and Request for Disclosure, and shows the Court:

### I. DISCOVERY CONTROL PLAN

1.    Plaintiff requests discovery to be conducted under Level 2 Discovery Control Plan-By Rule. See TEX. R. CIV. P. §190.3.

### II. INTRODUCTION & PARTIES

2.    This is a suit for judicial review lawsuit of a final administrative decision of the Texas Department of Insurance-Division of Workers' Compensation and for a declaratory judgment concerning the Texas Workers' Compensation Act.

3.    Plaintiff is Rosendo Morales, a severely injured worker, who resided and resides in Bell County.

4.    Defendant is the TEXAS MUTUAL Insurance Company, the Insurance Carrier for purposes of Workers' Compensation. Texas Mutual has been served and has answered.

---

Cause No. 269,135-B Morales v. Texas Mutual Ins. Co & DWC <u>Plaintiff s 1st Amended Petition & RFD</u>          1



5. Texas Department of Insurance, Division of Workers' Compensation and Commissioner Rod Bordelon, in his official capacity, which are necessary parties because statutory construction of the agency's interpretation and improper application of the Workers' Compensation Act (the Texas WC Act) is challenged, are defendants, the DWC and the Commissioner herein. Texas Department of Insurance – Division of Workers' Compensation, DWC, is a governmental unit organized and existing under the law of the State of Texas, and Commissioner Rod Bordelon, in his official capacity, in his official capacity as the Commissioner of the Workers' Compensation Division are located at the Texas Department of Insurance- Division of Workers' Compensation, 7551 Metro Center Drive, Suite 100, Austin, TX, 78744. Plaintiff requests service on the DWC and the Commissioner at the above address.

## III. JURISDICTION & VENUE

6. This Court has jurisdiction under Texas Labor Code Section 410.252 because Rosendo Morales, the injured worker and Plaintiff, resided in Bell County at the time of his injury.

## IV. BRIEF STATEMENT OF FACTS

7. Rosendo Morales the injured worker and Claimant, suffered a compensable injury on November 22, 2010, while in the course and scope of his employment with Perry & Perry Builders Inc., Employer, which provided workers' compensation insurance on the date of injury through Texas Mutual Insurance Company.

8. Mr. Morales reached maximum medical improvement by statute on December 26, 2012.

9. After a Texas Department of Insurance-Division of Workers' Compensation (DWC) contested case hearing, the challenged disputed issue was: "1. What is the Claimant's impairment rating?" The final DWC determination was a 13% impairment rating as determined

by the designated doctor, and Plaintiff disputes and disagrees with this rating including that it is invalid and erroneous. *See attached* Plaintiff Exhibit "A" DWC hearings decision of October 24, 2013, and notice of becoming the final administrative decision on January 27, 2014.

## V. RELIEF SOUGHT AS TO WORKERS' COMPENSATION CLAIM

10. Rosendo Morales is aggrieved by and seeks relief from and reversal of the final DWC decision and order and contested case hearing decision and order on the impairment rating issue (see attached Exhibit A), and specifically Rosendo Morales requests this Court to determine that his impairment rating is either 35% as assigned by Dr. Weeks or a 32% based on Dr. Weeks alternative rating for the cervical spine injury.

11. Further the erroneous 13% impairment rating assigned by the designated doctor is invalid and the designated doctor is not entitled to presumptive weight on judicial review.

## VI. DECLARATORY JUDGMENT

12. Rosendo Morales asserts the need for declaratory relief in this matter under the Uniform Declaratory Judgments Act including under Texas Civil Practice & Remedies Code section 37.004. Rosendo Morales further requests a declaratory judgment ruling that spine impairment ratings under the Texas Workers' Compensation Act must take into consideration spinal surgeries and the effects of spinal surgeries when the surgeries occur prior to maximum medical improvement being reached. This legal question of whether spinal surgery occurring before MMI must be considered in assigning an impairment rating was left open in *Severiano DeLeon v. Royal Indemnity Company*, 396 S.W.3d 597, 2010 Tex. App. LEXIS 565 (Tex. App.-- Austin 2010) *rev'd on other grounds Severiano DeLeon v. Royal Indem. Co.*, 396 S.W.3d 527, 2012 Tex. LEXIS 972, 56 Tex. Sup. Ct. J. 108 (Tex. 2012).

13. Plaintiff requests this Court declare that under Texas Labor Code Sections 401.011 and Chapter 408 concerning impairment ratings that the DWC designated doctor's report is legally invalid because while clearly aware or the pre-MMI surgery completely ignored the serious type of a spinal fusion surgery. This requires a declaration of the parties' rights under the Texas Workers' Compensation Act. The date of maximum medical improvement under the Texas Workers' Compensation Act means:

(30) "Maximum medical improvement" means the earlier of:
(A) the earliest date after which, based on reasonable medical probability, further material recovery from or lasting improvement to an injury can no longer reasonably be anticipated;
(B) the expiration of 104 weeks from the date on which income benefits begin to accrue; or
(C) the date determined as provided by Section 408.104.

The Legislature has defined "impairment" as "any anatomic or functional abnormality or loss existing after maximum medical improvement that results from a compensable injury and is reasonably presumed to be permanent." Under Section 401.011 (23) the Legislature's definitions are as follows:

(23) "Impairment" means any anatomic or functional abnormality or loss **existing after maximum medical improvement** that results from a compensable injury and is reasonably presumed to be permanent.
(24) "Impairment rating" means the percentage of permanent impairment of the whole body resulting from a compensable injury.

The Court should declare and enforce against the DWC Defendants and Texas Mutual that an "impairment" must be from an examination done after MMI has been reached and must be based upon the doctor's evaluation of the injured worker's condition after MMI including full consideration of the surgeries and the effects of surgery prior to MMI being reached. The DWC Defendants and Texas Mutual have misinterpreted and failed to properly apply the law. The

DWC Defendants and Texas Mutual may not ignore and must consider invalid an impairment rating that does not follow the Texas Workers' Compensation Act which requires pre-MMI surgeries and the effects of the surgery to be considered in assigning an impairment. This Court should so declare and enforce.

14. Further, Plaintiff requests this Court to declare that the statutory version of the AMA Guides adopted under Texas Labor Code Section 408.124(c), specifically the fourth edition of the "Guides to the Evaluation of Permanent Impairment," published by the American Medical Association (the AMA Guides). The DWC Defendants and Texas Mutual have misinterpreted and failed to properly apply the AMA Guides and Defendants may not ignore and must consider invalid an impairment rating that does not follow the AMA Guides which require pre-MMI surgeries and the effects of the surgery to be considered in assigning an impairment. This Court should so declare and enforce.

15. Mr. Morales requests this Court to declare that spinal surgeries and the effects of surgery occurring before maximum medical improvement is reached must be considered in assigning an impairment rating to injured workers under the Texas Workers' Compensation Act. Answering this statutory and administrative rule interpretation will affect the validity of the impairment ratings for spinal injuries under the Texas Workers' Compensation Act.

16. The DWC Defendants and Texas Mutual have not properly applied or interpreted the statutory provisions affecting the DWC Defendants, Texas Mutual Insurance Company and injured workers with regards to spinal surgeries occurring before maximum medical improvement and the required consideration of such surgeries in assigning impairment ratings under the Texas Workers' Compensation Act and the applicable administrative rules concerning

maximum medical improvement, spinal surgeries, and impairment ratings.

17. This Court should declare that the Texas Workers' Compensation Act and the AMA Guides require that impairment ratings must take into consideration spinal surgeries and the effects of spinal surgeries occurring prior to an injured worker reaching maximum medical improvement and that any impairment ratings that do not consider such surgeries are legally invalid. If a conflict exists between the Texas Workers' Compensation Act and the AMA Guides, this Court should declare the Texas Workers' Compensation Act controls and requires pre-MMI surgeries and their effects to be considered in determining an impairment and impairment rating of a worker including Mr. Morales.

18. Plaintiff, Rosendo Morales, is entitled to recover reasonable and necessary attorney fees that are equitable and just under Texas Civil Practice & Remedies Code section 37.009 because this is a suit in part for declaratory relief including the construction, validity, and the correct application of several statutes and administrative rules. Plaintiff also requests this Court award attorney fees pursuant to the Texas Workers' Compensation Act.

## VII. REQUEST FOR DISCLOSURE TO ALL DEFENDANTS

19. Under the authority of Texas Rule of Civil Procedure 194, Plaintiff Rosendo Morales requests that Defendants DWC and Commissioner Bordelon and Defendant Texas Mutual Insurance Company disclose, within 30 days of the service of this request or 50 days if served with the original petition, the information or material described in rule 194.2.

## VIII. PRAYER

For these reasons, Rosendo Morales asks the Court to grant the relief requested herein including for the Court to determine that he is entitled to a 35% impairment rating or

alternatively a 32% rating. Mr. Morales asks this Court to declare that spinal surgeries and the effects of such surgeries occurring prior to maximum medical improvement must be considered in assigning impairment ratings under the Texas Workers' Compensation Act and under the AMA Guides and that any impairment ratings that do not consider such surgeries are invalid. Mr. Morales asks the Court to set aside as null and void the final DWC decision and order. Mr. Morales also asks that the Court rule in his favor and enter judgment for the relief requested herein and to award his reasonable and necessary attorney fees as allowed under the declaratory judgment act and under the Texas Workers' Compensation Act, court costs and all other relief to which he is entitled.

Respectfully submitted,
/s/ Brad McClellan
Bradley Dean McClellan
State Bar No. 13395980
Of Counsel, The Law Offices of Richard Pena, P.C.
1701 Directors Blvd., Suite 110
Austin, Texas 78744
Brad.McClellan@yahoo.com
Fax 512.327.8354
Telephone 512.327.6884
ATTORNEYS FOR ROSENDO MORALES

## CERTIFICATE OF SERVICE

I certify that on May 22, 2014, a true and correct copy of the above and below was served on:

Attention: Matthew Foerster
Arnold & Placek, LLC
203 East Main Ave, Ste. 203
Round Rock, TX 78664
Fax: 512 341.7121
Attorneys for Defendant

Via eservice and email

/s/ Brad McClellan
Brad McClellan



# TEXAS DEPARTMENT OF INSURANCE
# DIVISION OF WORKERS' COMPENSATION

Si prefiere hablar con una persona de habla hispana acerca de esta correspondencia o de su reclamo, sírvase llamar al 1-800-252-7031.

January 27, 2014

LAW OFFICES OF RICHARD PENA
BRADLEY D. MCCLELLAN
1701 DIRECTORS BLVD STE 110
AUSTIN, TX 78744-1144

**Appeal No:** 132808
**Docket No:** 11156576-02-A1
**Carrier No:** 99L0000628987
**Employee:** ROSENDO MORALES
**Employer:** PERRY & PERRY BUILDERS INC

**Date of Injury:** **November 22, 2010**

After review by the Appeals Panel this Notice is the decision filed with the Deputy Commissioner of Hearings regarding the matters in dispute and in response to a request for review by the Appeals Panel of the Hearing Officer's Decision and Order. Accordingly, this constitutes notice that the Hearing Officer's Decision and Order signed on     October 22, 2013     became final on the date listed at the top of this notice under the provisions of §410.169 or §410.204(c) of the Texas Labor Code. If the Hearing Officer's Decision and Order became final under §410.169, a notice of untimely appeal is enclosed.

If you are not satisfied with this decision and desire to have the dispute resolved in court, then you must file a lawsuit in the appropriate district court not later than the 45th day after the date on which the Division of Workers' Compensation mailed the parties the decision of the Appeals Panel pursuant to Labor Code, Section 410.252. A copy of any such lawsuit must be filed simultaneously with the CHIEF CLERK OF PROCEEDINGS, TEXAS DEPARTMENT OF INSURANCE, DIVISION OF WORKERS' COMPENSATION, P.O. BOX 17787, AUSTIN, TEXAS, 78744-7787.

Claimants that are not represented by an attorney may consult with an attorney of their choice for further assistance.

Sincerely,

TEXAS DEPARTMENT OF INSURANCE
DIVISION OF WORKERS' COMPENSATION

# Plaintiff's Exhibit A

**THIS LETTER WAS ALSO SENT TO THE FOLLOWING:**

ROSENDO MORALES

TEXAS MUTUAL INSURANCE CO
6210 E HIGHWAY 290
AUSTIN, TX 78723-1026


ATTORNEY AT LAW
SCOTT D. BOUTON
PO BOX 2689
PFLUGERVILLE, TX 78691-2689


**INFORMATION COPIES WERE ALSO SENT TO:**

PERRY & PERRY BUILDERS INC
PO BOX 1048
ROCKDALE, TX 76567-1048



## TEXAS DEPARTMENT OF INSURANCE
## DIVISION OF WORKERS' COMPENSATION

Si prefiere hablar con una persona de habla hispana acerca de esta correspondencia o de su reclamo, sírvase llamar al 1-800-252-7031.

October 24, 2013

LAW OFFICES OF RICHARD PENA
BRADLEY D. MCCLELLAN
1701 DIRECTORS BLVD STE 110
AUSTIN, TX 78744-1144

DWC No: 11156576
Docket No: 11156576-02-CC
Carrier No: 99L0000628987
Employee: ROSENDO MORALES
Employer: PERRY & PERRY BUILDERS INC

Date of
Injury: November 22, 2010

The Hearing Officer has reached a decision and entered an order in the above referenced claim. Copies of the decision and a fact sheet are attached explaining what to do if you want to appeal this Hearing Officer's decision or if the other party appeals the decision.

Please note that if the Carrier has been ordered to pay benefits in accordance with this decision, those benefits, unless otherwise noted, include both indemnity and medical benefits.

If you have questions or require assistance, please call 1-800-252-7031. To expedite the handling of requests for appeal and responses to requests for appeal, all correspondence should be addressed to the:

CHIEF CLERK OF PROCEEDINGS, HEARINGS
TEXAS DEPARTMENT OF INSURANCE
DIVISION OF WORKERS' COMPENSATION
POST OFFICE BOX 17787
AUSTIN, TEXAS 78744-7787

Sincerely,

Texas Department of Insurance
Division of Workers' Compensation

**THIS LETTER WAS ALSO SENT TO THE FOLLOWING:**

ROSENDO MORALES



TEXAS MUTUAL INSURANCE CO
6210 E HIGHWAY 290
AUSTIN, TX 78723-1026

ATTORNEY AT LAW
SCOTT D. BOUTON
PO BOX 2689
PFLUGERVILLE, TX 78691-2689

**INFORMATION COPIES WERE ALSO SENT TO:**

PERRY & PERRY BUILDERS INC
PO BOX 1048
ROCKDALE, TX 76567-1048

DR03

WA 11156576-02-CC

57

CONFIDENTIAL
Tex. Labor Code
§402.083

# TEXAS DEPARTMENT OF INSURANCE
# DIVISION OF WORKERS' COMPENSATION
## WACO FIELD OFFICE
## WACO, TEXAS

TDI/DWC
RECEIVED
OCT 2 2 2013
CHIEF CLERK OF PROCEEDINGS

| | | |
|---|---|---|
| ROSENDO MORALES, CLAIMANT | § § § § | |
| v. | § § | DOCKET NO. WA-11-156576-02-CC-WA41 |
| TEXAS MUTUAL INSURANCE COMPANY, CARRIER | § § § § | |

## DECISION AND ORDER

This case is decided pursuant to Chapter 410 of the Texas Workers' Compensation Act and Rules of the Division of Workers' Compensation adopted thereunder.

## ISSUES

A benefit review conference was held on June 4, 2013, to mediate resolution of the disputed issue; however, the parties were unable to reach an agreement. After a continuance from July 24, 2013, a contested case hearing was held on July 30, 2013, followed by a continuance on August 19, 2013, and a contested case hearing held on October 14, 2013, to decide the following disputed issue:

1.      What is the Claimant's impairment rating?

The Hearing Officer added the following issue:

2.      Did Carrier have good cause for failing to appear at the scheduled contested case hearing on July 30, 2013?

Though not certified, the following issue was added because it was actually litigated:

3.      Is venue proper in the Waco Field Office of the Texas Department of Insurance, Division of Workers' Compensation?

## PARTIES PRESENT

Claimant appeared and was represented by Bradley D. McClellan, attorney, at the contested case hearings on July 30, 2013, and on October 14, 2013. Carrier failed to appear at the contested

1

58

CONFIDENTIAL
Tex. Labor Code
§402.083

case hearing on July 30, 2013; and was represented by Scott D. Bouton, attorney, at the hearing on October 14, 2013.

## OFFICIAL NOTICE

Official notice was taken of the MapQuest mileage guides.

## EVIDENCE PRESENTED

The following witnesses testified:

For Claimant: Claimant.

For Carrier: None.

The following exhibits were admitted into evidence:

Hearing Officer's Exhibits: HO-1 through HO-7.

Claimant's Exhibits: C-1 through C-12.

Carrier's Exhibits: CR-A through CR-O.

## BACKGROUND INFORMATION

Concerning the issue of Carrier's failure to appear, a benefit review conference was held on June 4, 2013, following a request to change venue from Waco to Austin. Following the benefit review conference held in the Austin Field Office on June 4, 2013, the contested case hearing was scheduled to be held in the Austin Field Office on July 24, 2013. Due to a subsequent change of venue, the contested case hearing was not held in the Austin Field Office on July 24, 2013, but was continued on June 27, 2013, and rescheduled to be held in the Waco Field Office. On June 27, 2013, the parties, including Carrier, were sent notice of the scheduled contested case hearing to be held in the Waco Field Office on July 30, 2013. Carrier failed to appear for the contested case hearing scheduled for 10:30 AM on Tuesday, July 30, 2013. Carrier responded to the 10-day show cause letter that was mailed to Carrier on July 30, 2013, and requested that the hearing be rescheduled to permit it to present evidence on the disputed issue. Following a continuance from August 19, 2013, a contested case hearing was held on October 14, 2013. At the contested case hearing on October 14, 2013, Mr. Scott D. Bouton, the attorney representing Carrier, explained that he was in Laredo, Texas, representing Carrier on July 30, 2013, and was unable to attend the scheduled contested case for that date; however, Mr. Bouton did not explain why Carrier was unable to attend the scheduled contested case hearing for July 30, 2013.

At the contested case hearing on October 14, 2013, Mr. Bouton stated that Carrier would not stipulate that venue was proper in the Waco Field Office of the Texas Department of Insurance,

2

59

CONFIDENTIAL
Tex. Labor Code
§402.083

Division of Workers' Compensation. Mr. Bouton contended that venue was proper either in the Waco Field Office or the Austin Field Office, and that Carrier believed that venue was proper in the Austin Field Office. Claimant testified that he lived and resided at ████████████ ██████████ on November 20, 2010, the date of his compensable injury, and that he wanted his contested case hearing to be conducted in the Waco Field Office. Official Notice was taken of the MapQuest mileage guide (MapQuest) and also made a Hearing Officer's exhibit. According to MapQuest, it is 35.09 miles one-way from Claimant's residence in Temple, Texas, to the Waco Field Office of the Texas Department of Insurance, Division of Worker's Compensation located at 801 Austin Avenue, Waco, Texas, and it is 57.32 miles one-way from Claimant's residence in Temple, Texas, to the Austin Field Office of the Texas Department of Insurance, Division of Worker's Compensation located at 4616 W Howard Lane, Suite 130, Austin, Texas. Claimant contended that venue was proper in the Waco Field Office of the Texas Department of Insurance, Division of Worker's Compensation, and cited Texas Labor Code §410.005 concerning venue for a contested case hearing. According to Texas Labor Code §410.005(a), the statue states that "unless the division determines that good cause exists for the selection of a different location, a benefit review conference or a contested case hearing may not be conducted at a site more than 75 miles from the claimant's residence at the time of the injury." In this case, Claimant indicated that he wanted the contested case hearing to be held in the Waco Field Office of the Texas Department of Insurance, Division of Worker's Compensation, and there was no good cause determination that the contested case hearing should be held at any other location other than the Waco Field Office of the Texas Department of Insurance, Division of Workers' Compensation.

In regard to the issue of impairment rating (IR), Claimant, a welder, sustained a compensable left shoulder contusion, left upper arm contusion, right heel contusion, right knee contusion, right knee meniscal tear and arthritis, neck contusion, and C5-6 radiculopathy injury on November 22, 2010. The parties stipulated that Claimant reached maximum medical improvement (MMI) on the statutory date of December 26, 2012, for the compensable injury of November 22, 2010, as certified by Anil Tukarampant Bangale, M.D., the Division-selected designated doctor, and Trenton D. Weeks, D.C., the treating doctor referral.

Dr. Bangale was appointed as the designated doctor by the Division to evaluate Claimant for the compensable injury to determine MMI, IR, and extent of injury. Dr. Bangale evaluated Claimant on January 4, 2013, and determined that Claimant reached MMI on an incorrect statutory date of November 22, 2012, and assigned a 13% IR for the compensable injury that included 7% IR for the left shoulder contusion and left upper arm contusion; 0% IR for the right heel contusion; 1% for the right knee contusion and right knee meniscal tear and arthritis; and 5% IR for the neck contusion and C5-6 radiculopathy under DRE Category II for the cervical spine. Following a letter of clarification, Dr. Bangale amended his prior certification and determined that Claimant reached MMI on the statutory date of December 26, 2012, and again assigned a 13% IR for the compensable injury. Concerning his placement of Claimant under DRE Category II for the cervical spine, Dr. Bangale stated that he was aware that Claimant had undergone a multi-level spinal fusion of the cervical spine. Dr. Bangale further stated that Claimant did not have signs of

3

60

CONFIDENTIAL
Tex. Labor Code
§402.083

cervical radiculopathy based on his clinical examination of Claimant and there was no loss of motion segment integrity.

Dr. Weeks, the treating doctor referral, evaluated Claimant on December 4, 2012, and determined that Claimant reached MMI on December 4, 2012, and assigned a 17% IR for the compensable injury. Dr. Weeks agreed with the IR that Dr. Bangale assigned for the compensable injury except Dr. Weeks opined that Claimant should be assigned 10% IR under DRE Category III for the cervical spine rather than the 5% IR that Dr. Bangale had assigned under DRE Category II. Dr. Weeks subsequently reevaluated Claimant on April 9, 2013, and determined that Claimant reached MMI on the statutory date of December 26, 2012, and assigned a 35% IR for the compensable injury. Dr. Weeks reiterated that he agreed with the IR that Dr. Bangale assigned for the compensable injury except Dr. Weeks opined that Claimant should be assigned 27% IR under the Range of Motion (ROM) Model for the cervical spine rather than the 5% IR that Dr. Bangale assigned under DRE Category II of the cervical spine. Dr. Weeks indicated that he used the ROM Model instead of the DRE Model because Claimant had undergone a multi-level cervical fusion surgery.

Based on the evidence presented in the hearing, the preponderance of the evidence is not contrary to the determination by Dr. Bangale, the Division-selected designated doctor, that Claimant's IR is 13% for the compensable injury. In addition, Carrier did not have good cause for failing to appear at the scheduled contested case hearing on July 30, 2013, and venue is proper in the Waco Field Office of the Texas Department of Insurance, Division of Workers' Compensation.

Even though all the evidence presented was not discussed, it was considered. The Findings of Fact and Conclusions of Law are based on all of the evidence presented.

## FINDINGS OF FACT

1.  The parties stipulated to the following facts:

    A.  On November 22, 2010, Claimant was the employee of Perry & Perry Builders, Inc., Employer.

    B.  On November 22, 2010, Employer provided workers' compensation insurance with Texas Mutual Insurance Company, Carrier.

    C.  It is undisputed that Claimant sustained a compensable left shoulder contusion, left upper arm contusion, right heel contusion, right knee contusion, right knee meniscal tear and arthritis, neck contusion, and C5-6 radiculopathy injury on November 22, 2010.

4

CONFIDENTIAL
Tex. Labor Code
§402.083

D.      Anil Tukarampant Bangale, M.D., was appointed as the designated doctor by the Division to evaluate Claimant for the compensable injury of November 22, 2010, to determine MMI, IR, and extent of injury.

E.      Claimant reached statutory MMI on December 26, 2012, for the compensable injury of November 22, 2010, as certified by Anil Tukarampant Bangale, M.D., the Division-selected designated doctor, and Trenton D. Weeks, D.C., the treating doctor referral.

2.      Carrier delivered to Claimant a single document stating the true corporate name of Carrier, and the name and street address of Carrier's registered agent, which document was admitted into evidence as Hearing Officer's Exhibit Number 2.

3.      On June 27, 2013, Carrier was sent notice by the Division of the scheduled contested case hearing to be held on at 10:30 AM on Tuesday, July 30, 2013, in the Waco Field Office of the Texas Department of Insurance, Division of Workers' Compensation.

4.      Carrier failed to appear at the scheduled contested case hearing on July 30, 2013, and was sent a 10-day show cause letter on July 30, 2013.

5.      Carrier timely responded to the 10-day show cause letter and requested that the contested case hearing be rescheduled to permit it to present evidence on the disputed issue and to show cause why it failed to appear for the scheduled contested case hearing on July 30, 2013.

6.      The contested case hearing was rescheduled and held on Monday, October 14, 2013, and Carrier did not offer a good cause explanation why Carrier was unable to attend the scheduled contested case hearing on July 30, 2013.

7.      Claimant lived and resided at ███████████████████ on November 20, 2010, the date of his compensable injury.

8.      The Waco Field Office of the Texas Department of Insurance, Division of Worker's Compensation, is located within 75 miles of Claimant's residence and it is 35.09 miles one-way from Claimant's residence in Temple, Texas, to the Waco Field Office of the Texas Department of Insurance, Division of Worker's Compensation located at 801 Austin Avenue, Waco, Texas.

9.      There has not been a good cause determination by the Division that the contested case hearing should be held at any other location other than the Waco Field Office of the Texas Department of Insurance, Division of Workers' Compensation and the Division scheduled the contested case hearing in accordance with Texas Labor Code §410.005(a).

5

62

10. The determination of Anil Tukarampant Bangale, M.D., the Division-selected designated doctor, that Claimant's IR is 13% for the compensable injury of November 22, 2010, is not contrary to the preponderance of the evidence.

## CONCLUSIONS OF LAW

1. The Texas Department of Insurance, Division of Workers' Compensation, has jurisdiction to hear this case.

2. Venue is proper in the Waco Field Office of the Texas Department of Insurance, Division of Workers' Compensation.

3. Carrier did not have good cause for failing to appear at the scheduled contested case hearing on July 30, 2013.

4. Claimant's IR is 13%.

## DECISION

Venue is proper in the Waco Field Office of the Texas Department of Insurance, Division of Workers' Compensation. Carrier did not have good cause for failing to appear at the scheduled contested case hearing on July 30, 2013. Claimant's IR is 13%.

## ORDER

Carrier is ordered to pay benefits in accordance with this decision, the Texas Workers' Compensation Act, and the Commissioner's Rules. Accrued but unpaid income benefits, if any, shall be paid in a lump sum together with interest as provided by law.

The true corporate name of the insurance carrier is **TEXAS MUTUAL INSURANCE COMPANY**, and the name and address of its registered agent for service of process is

**ROBERT J. GERGASKO, PRESIDENT**
**6210 EAST HIGHWAY 290**
**AUSTIN, TEXAS 78723**

Signed this 22nd day of October, 2013.

Wes Peyton
Hearing Officer

6

63

# American Medical Association
Physicians dedicated to the health of America



# Guides to the Evaluation of Permanent Impairment

# Fourth Edition

*Chapter 1*

# Impairment Evaluation

I s it possible to improve estimates of the severity of human impairments, basing them on accepted medical standards? Can those estimates be used in comparing, evaluating, and adjudicating claims of ill health and impairment arising in workers' compensation cases, Social Security Administration cases, and other types of cases?

This book, *Guides to the Evaluation of Permanent Impairment (Guides)*, began to take form during the 1950s under the premise that the answer to the first question is "yes." An ad hoc committee appointed by the Board of Trustees of the American Medical Association (AMA) gave impetus to the effort. The first edition of the *Guides* was published in 1971, and those involved with succeeding editions have sought to improve and refine it, to the end that it could be useful anywhere when questions arise about people's physical and mental functioning and capabilities.

The *Guides* provides a standard framework and method of analysis through which physicians can evaluate, report on, and communicate information about the impairments of any human organ system. The book uses up-to-date information on impairment and illness provided by knowledgeable clinicians and scholars. In the physician's office, the book can be an aid to making the diagnosis of an impairment and following the course of therapy.

## 1.1 Impairment, Disability, Handicap

Impairment is defined in the *Guides* as an alteration of an individual's health status. Impairment, according to the *Guides*, is assessed by medical means and is a medical issue. An impairment is a deviation from normal in a body part or organ system and its functioning. The *Guides* defines "permanent impairment" as one that has become static or stabilized during a period of time sufficient to allow optimal tissue repair, and one that is unlikely to change in spite of further medical or surgical therapy.

The *Guides* definition of an impairment closely parallels that of the World Health Organization (WHO), which has defined an impairment as "any loss or abnormality of psychological, physiological, or anatomical structure or function."[1]

In the *Guides*, impairments are defined as conditions that interfere with an individual's "activities of daily living," some of which are listed in the Glossary (p. 315). Activities of daily living include, but are not limited to, self-care and personal hygiene; eating and preparing food; communication, speaking, and writing; maintaining one's posture, standing, and sitting; caring for the home and personal finances; walking, traveling, and moving about; recreational and social activities; and work activities.

## 1.2 Structure and Use of the *Guides*

Using the *Guides* requires integrating previously gathered medical information with the results of a current medical evaluation. The evaluation should be carried out in accordance with the directions in the *Guides*, and it should be based on three components.

First, certain types of information, described in Chapter 2, are needed to document the nature of an impairment and its consequences. Chapter 2 specifies how to acquire information and defines a format for analyzing, recording, and reporting the information. Second, the *Guides* chapters on the organ systems contain protocols or descriptions of ways to evaluate a particular body part, function, or system. Third, the chapters contain tables relating to the evaluation protocols. If the physician has followed the protocols and tables, then the reported findings will be congruent with the *Guides* criteria.

In practice, the first key to effecting an accurate impairment evaluation is a review of office and hospital records maintained by the physicians who have cared for the patient since the onset of the medical condition. Such records include clinical notes, medical consultation reports, hospital records, admission and discharge summaries, notes on operations, pathology and laboratory test reports, and reports on special tests and diagnostic procedures. Using multiple sources of information and attempting to ensure that the sources are objective can help eliminate bias, an error introduced by selecting or encouraging one outcome over another.

Before judgments according to the *Guides* are accepted, the history and course of the medical condition must be analyzed. This analysis should include findings from previous examinations, the treatment and responses to treatment, and the impact of the condition on the patient's activities. Before a judgment regarding impairment is made, it must be shown that the problem has been present for a period of time, is stable, and is unlikely to change in future months in spite of treatment.

In evaluating an impairment, it is important to obtain enough clinical information to characterize it in accordance with the *Guides* requirements. Once this task is accomplished, the evaluator's findings may be compared with the clinical information already available about the individual. If the evaluator's findings are consistent with the results of previous clinical studies, the findings may be compared with the *Guides* criteria to estimate the impairment. If the findings are not consistent with those of earlier studies, there should be communication between the involved physicians and clinical studies as needed to resolve any disparities.

## 1.3 Are the *Guides* Criteria Objective and Authoritative?

The contributors to the *Guides* understand the importance of having objective data on the functioning of normal persons' organ systems in order to evaluate those of impaired individuals. For many systems (eg, the respiratory, cardiovascular, visual, auditory, endocrine, hematologic, and digestive systems), medically accepted and scientifically derived data on normal functioning are available. The *Guides* generally makes use of these data and references their sources.

If the *Guides* contributors have been unable to identify objective data on the normal functioning of an organ system, they have estimated the extent of impairments on the basis of clinical experience, judgment, and consensus. The estimates of the well qualified persons contributing to this book, most of them physicians, would be more convincing than those of most others in estimating the severity of people's impairments.

It should be understood that the *Guides* does not and cannot provide answers about every type and degree of impairment, because of the considerations noted above and the infinite variety of human disease, and because the field of medicine and medical practice is characterized by constant change in understanding disease and its manifestations, diagnosis, and treatment. Further, human functioning in everyday life is a highly dynamic process, one that presents a great challenge to those attempting to evaluate impairment.

The physician's judgment and his or her experience, training, skill, and thoroughness in examining the patient and applying the findings to *Guides* criteria will be factors in estimating the degree of the patient's impairment. These attributes compose part of the "art" of medicine, which, together with a foundation in science, constitute the essence of medical practice. The evaluator should understand that other considerations will also apply, such as the sensitivity, specificity, accuracy, reproducibility, and interpretation of laboratory tests and clinical procedures, and variability among observers' interpretations of the tests and procedures.

## 1.4 Is the *Guides* Widely Used?

In a word, yes. Recently compiled data from a 1991 AMA survey indicate that in 40 of 53 jurisdictions (38 states and two territories), use of the *Guides* is *mandated* or *recommended* by law in workers' compensation cases, or the book is frequently used in such

# Records
# and Reports

E stimating the extent of permanent impairments is most effective when there is sufficient medical and nonmedical information to justify the estimates and minimize adversarial situations. This chapter describes how the *Guides* can help provide consistent and reliable acquisition, analysis, communication, and utilization of medical information.

The major objective of the *Guides* is to define the assessment and reporting of medical impairments so that physicians can collect, describe, and analyze information about impairments in accordance with a single set of standards. Two physicians, following the methods of the *Guides* to evaluate the same patient, should report similar results and reach similar conclusions. Moreover, if the clinical findings are fully described, any knowledgeable observer may check the findings with the *Guides* criteria.

If two physicians who examine a patient and use the methods of the *Guides* do not obtain similar results and reach similar conclusions, then the book can be used to resolve the discrepancies. Analysis of the records and reports in question will disclose the disparities, which should be in matters of fact rather than opinion. If the patient's medical condition is stable, then different physicians should reach the same general conclusion. If widely disparate evaluations occur, then the stability of the medical condition and the matter of permanent impairment would be in question.

Compare this approach with some impairment evaluations wherein physicians examine and report on patients without a standard protocol. In such instances, it is impossible to compare reports, because there is no assurance that the physicians have examined the same body parts or systems in the same way. For example, one physician may measure flexion of the hip or knee, but another may not mention those movements. Or one physician may report that the patient can flex the arm 90°, while another may not measure the range of motion. Without standardization of evaluations and reporting procedures, an individual reading these reports would have difficulty deciding which report to believe. This outcome is neither reasonable nor fair, and it tends to give rise to avoidable confrontation.

When physicians follow the *Guides* to measure and report their impairment estimates, the persons who receive the evaluations may be held accountable for assessing the results in accordance with the *Guides* recommendations. Because issues of medical fact should have been settled by this stage in the process, the recipients of the evaluations should not find it necessary to choose among conflicting opinions.

By consulting the standardized medical evaluation protocols and reference tables and reviewing the recommendations of the *Guides*, the recipient may verify whether or not all necessary information was collected. If it was, the correctness of the evaluation may be ascertained by comparing it with the *Guides*

## Interpolating, Measuring, and Rounding Off

In general, an impairment value that falls between those appearing in a table or figure of the *Guides* may be adjusted or interpolated to be proportional to the interval of the table or figure involved, unless the book gives other directions.

Unless generally accepted standards exist, as with many laboratory tests, two measurements made by the same examiner and involving a patient or a patient's functions may be expected to lie within 10% of each other.

Measurements should be consistent between two trained observers; if they have been made by one observer on separate occasions, they also should be consistent. Repeating measurements may increase their credibility.

A final estimated whole-person impairment percent, whether it is based on the evaluation of one organ system or several organ systems, may be rounded to the nearer of the two nearest values ending in 0 or 5.

## Pain

In general, the impairment percents shown in the chapters that consider the various organ systems make allowance for the pain that may accompany the impairing conditions. Chronic pain, also called the chronic pain syndrome, is evaluated as described in the chapter on pain (p. 303).

## Using Prostheses in Evaluations

The general view of the *Guides* is that if an individual's prosthesis or assistive device can be removed or its use eliminated relatively easily, the organ system should be tested and evaluated without the device. For example, a hearing aid should be removed before auditory acuity is tested. However, the examiner may choose to test the system with the assistive device in place also and then report both sets of results.

If the assistive device is not easily removable, as with an implanted lens, the organ system's functioning should be evaluated with the device in place. The visual system should be tested with the patient's glasses or contact lenses in place if they are used.

## Adjustments for Effects of Treatment or Lack of Treatment

In certain instances, the treatment of an illness may result in apparently total remission of the patient's signs and symptoms. Examples include the treatment of hypothyroidism with levothyroxine and the treatment of type I diabetes mellitus with insulin. Yet it is debatable as to whether the patient has regained the previous status of normal good health. In these instances, the physician may choose to increase the impairment estimate by a small percentage (eg,

1% to 3%), combining that percent with any other impairment percent by means of the Combined Values Chart (p. 322).

In some instances, as with the recipients of transplanted organs who are treated with immunity-suppressing pharmaceuticals or persons treated with anticoagulants, the pharmaceuticals themselves may lead to impairments. In such an instance, the physician should use the appropriate parts of the *Guides* to evaluate the impairment related to the pharmaceutical. If information in the *Guides* is lacking, the physician may combine an estimated impairment percent, the magnitude of which would depend on the severity of the effect, with the primary organ system impairment, by means of the Combined Values Chart.

A patient may decline treatment of an impairment with a surgical procedure, a pharmacologic agent, or other therapeutic approach. The view of the *Guides* contributors is that if a patient declines therapy for a permanent impairment, that decision should neither decrease nor increase the estimated percentage of the patient's impairment. However, the physician may wish to make a written comment in the medical evaluation report about the suitability of the therapeutic approach and describe the basis of the patient's refusal.

# 2.3 General Comments on Evaluation

The *Guides* attempts to take into account all relevant considerations in estimating or rating the severity and extent of permanent impairment and the effects of the impairment in terms of the individual's everyday activities. An impairment should not be considered "permanent" until the clinical findings, determined during a period of months, indicate that the medical condition is static and well stabilized.

A physician who is asked to reevaluate an individual's impairment must realize that change may have occurred, even though a previous evaluator considered the impairment to be permanent. For instance, the condition may have become worse as a result of aggravation or clinical progression, or it may have improved. The physician should assess the *current* state of the impairment according to the criteria in the *Guides*.

Valid assessment of a change in the impairment estimate would depend on the reliability of the previous estimate and the reliability of the evidence on which it was based. If there were no valid previous evaluation, information gathered earlier could be used to estimate impairment according to *Guides* criteria. However, if there were insufficient informa-

## 3.3  The Spine

Symptoms related to the back and spine are among the most common of adults' everyday complaints. In most instances, people accept and tolerate the symptoms as one of the consequences of growing older, making minor concessions in activity. When the symptoms follow an injury or illness, sorting out the injury or illness component from the age-related component may be difficult or impossible.

One of the purposes of the *Guides* is to lead to similar results when different clinicians evaluate illnesses and impairments. For evaluating spine impairments, past *Guides* editions have used a system based on assessing the degree of spine motion and assigning impairment percents according to limitations of motion. Impairment percents related to the range of motion were to be combined with percents based on diagnoses or therapeutic approaches and neurologic impairments.

One concern with the range of motion system has been that in applying it, other clinical data and diagnostic information tend to be ignored. Also, some physicians are concerned about the accuracy and reproducibility of mobility measurements, while others believe the system fails to account for the effects of aging.

Spine mobility measurements, which are carried out with inclinometers, are more difficult to perform than are measurements of ranges of motion of the extremities, for which the hinged goniometer is used. With the latter technique, visualizing and measuring movement is easier, one extremity's movement may be checked against that of the other, and the patient's willingness to cooperate may be less of a factor.

Notwithstanding the concerns about inclinometers, a recent study of objective methods for examining patients with chronic low-back pain and self-reported, everyday disabilities identified seven clinical measurements that distinguish well between the patients with pain and normal subjects.[68] Four of the seven measurements are made with an inclinometer.

In this edition of the *Guides*, the contributors have elected to use two approaches. One component, which applies especially to patients' traumatic injuries, is called the "Injury Model." This part involves assigning a patient to one of eight categories, such as minor injury, radiculopathy, loss of spine structure integrity, or paraplegia, on the basis of objective clinical findings. The other component is the "Range of Motion Model," described above and recommended in previous *Guides* editions.

This approach to the evaluation of spine impairments was developed with the advice of an ad hoc committee of authorities knowledgeable about the musculoskeletal system, orthopedic surgery, neurosurgery, internal medicine, rehabilitation, impairment evaluation, and medical science. It is acknowledged that the approach is different from that of previous *Guides* editions, and that future developments may lead to refinement or to a different recommendation altogether.

The evaluator assessing the spine should use the Injury Model, if the patient's condition is one of those listed in Table 70 (p. 108). That model, for instance, would be applicable to a patient with a herniated lumbar disk and evidence of nerve root irritation. If none of the eight categories of the Injury Model is applicable, then the evaluator should use the Range of Motion Model.

All persons evaluating impairments according to *Guides* criteria are cautioned that either one *or* the other approach should be used in making the final impairment estimate. If one component were used according to *Guides* recommendations, then a final impairment estimate using the other component usually would not be pertinent or germane. However, if disagreement exists about the category of the Injury Model in which a patient's impairment belongs, then the Range of Motion Model may be applied to provide evidence on the question.

The newer Injury Model, which may also be called the "Diagnosis-Related Estimates (DRE) Model," is described in sections 3.3a through 3.3i of this chapter (pp. 95 through 106). Information on using the Range of Motion Model, which has also been called the "Functional Model," is presented in section 3.3j. The *Guides* user is reminded that each evaluation should include a complete, accurate medical history and a review of all pertinent records, a careful and thorough physical examination, a complete description of the patient's current symptoms and their relationship to daily activities, and all findings of relevant laboratory, radiologic, and ancillary tests.

It is emphasized that if an impairment evaluation is to be accepted as valid under the *Guides* criteria, the impairment being evaluated should be a *permanent* one, that is, one that is stable, unlikely to change within the next year, and not amenable to further medical or surgical therapy (refer to definition in *Guides* Chapter 1 and Glossary).

All spine impairment estimates shown in the tables of this section are estimates of *whole-person* impairments.

# 3.3a The Spine History

Much of the historical part of the impairment evaluation should be based on the patient's own statements rather than on secondhand information. While the medical history that the physician gathers should consider objective data from others, the physician should be cautious about using *only* information from others, especially subjective information. It is not appropriate to question the patient's integrity. If information from the patient does not make sense, or there are inconsistencies in the history, the physician should note this and describe the discrepancies in the record.

The medical history of the patient's spine-related symptoms and complaints must describe the chief complaint and the pain, numbness, weakness, anatomic location, frequency, and duration, then describe specifically how the condition interferes with daily activities (Fig. 61, p. 96). The physician should elicit the facts about when the condition started, the circumstances, the relationship to any previous spine problems, any precipitating events or factors, and the impact of the problem on daily activities.

The history should use the patient's description in his or her own words as to how the symptoms developed, the cause, the response to treatment, and the results of special studies that have been performed. The physician should review the roentgenograms personally, or report the roentgenographic findings as being those of another reviewer. It is helpful to record the patient's future plans, should the present symptoms and limitations not improve. A review of systems and of the medical history are needed to provide potentially useful information and to identify any complicating problems and requirements for diagnosis or care.

# 3.3b The Spine Examination

Many aspects of the physical examination are covered in other parts of the *Guides*. Much of the information pertaining to the examination for spine injury and impairment is neurologic in nature; thus, the physician must have a good grasp of neurologic principles and understand the material covered in the *Guides* chapter on the nervous system (p. 139) and in Section 3.1k (p. 46) of this chapter. Guided by the history (Fig. 61, p. 96), the physician should focus attention on spine-related physical findings, such as motor abilities, reflexes, muscle atrophy, anal tone, and the need for assistive devices.

Findings of atrophy should be related to possible explanations for the abnormality other than spine impairment, for instance, previous joint surgery or hypertrophy of the contralateral side from overuse. Other objective findings may be present relating to the motor and sensory systems, ranges of motion, and sciatic nerve tension. Examination of the vascular system and a follow-up of any possibly significant information from the history and physical examination will prepare the physician to make reasonable recommendations.

The physician should note any physical findings that are not consistent with the medical history. The physician should identify any information based on the patient's verbal responses or interpretation and not confuse it with objective clinical findings.

It is difficult to separate the cervical, thoracic, lumbar, and sacral spine regions functionally, because the signs related to the different regions commonly overlap. Upper lumbar spine impairments tend to behave more like those of the thoracic region than those of the lower lumber region, and the involved nerve plexuses expand the effects from the different levels. For instance, the brachial plexus is made up of nerve trunks from both the cervical and the upper thoracic regions, and the sciatic nerve includes components from both the lower lumbar and the sacral regions.

With the Injury or DRE Model, the main spine regions are termed the cervicothoracic, thoracolumbar, and lumbosacral regions. With this model, the cervicothoracic spine is considered to comprise 35% of total body function, the thoracolumbar spine 20%, and the lumbosacral spine 75%. Under the Range of Motion or Functional Model, the main regions are called the cervical, thoracic, and lumbar regions. With that model, the cervical spine is considered to be involved with 80% of the individual's functioning, the thoracic spine is involved with 40%, and the lumbosacral spine is involved with 90%. However, the structural, neurologic, vascular, and other activities mediated by the spine regions overlap and are difficult to separate.

With both the Injury Model and the Range of Motion Model, the normal percent of function of the spine or the whole person is 100%.

For the purposes of this book, the cervical region may be considered to represent the cervicothoracic region, the thoracic region to represent the thoracolumbar region, and the lumbar region to represent the lumbosacral region.

Figure 63 (p. 98) illustrates the measurements for angular motion. If the difference in motion, measured by flexion and extension films, between two angles (such as angles A and B in Fig. 63) is more than 15° at the lumbosacral joint or more than 11° at any other joint, there is loss of structural integrity.

The importance of careful and accurate roentgenographic studies cannot be overemphasized.

### Special Studies

The patient may have undergone roentgenographic, dye, electromyographic or electrodiagnostic, cystometric, or other types of studies. The examining physician should determine when, where, and by whom the studies were made, the findings, and who interpreted them. These records should be summarized in the history form (Fig. 61, p. 96) and included with the Report of Medical Evaluation (p. 11).

### Differentiators

In using the Injury Model, the physician or examiner may use certain clinical procedures or determinations in placing the patient's impairment in the proper category. These "differentiators" are described in Table 71 (p. 109) and are listed below.

No differentiator is required to place a patient in any impairment category. However, if a differentiator is present, it provides important evidence as to the category in which the patient belongs.

Impairment Category Differentiators
Guarding
Loss of reflex(es)
Decreased muscle circumference
Electrodiagnosis
Lateral motion roentgenograms
Loss of bowel or bladder control
Bladder studies
Range of Motion Model

If the physician cannot decide into which DRE category the patient belongs, the physician may refer to and use the Range of Motion Model, which is described in Section 3.3j (p. 113). Using the procedures of that model, the physician combines an impairment percent based on the patient's diagnosis with a percent based on the patient's spine motion impairment and a percent based on neurologic impairment, if it is present. The physician uses the estimate determined with the Range of Motion Model to decide placement within one of the DRE categories. The proper DRE category is the one having the impairment percent that is closest to the impairment percent determined with the Range of Motion Model.

### Structural Inclusions

Certain spine fracture patterns may lead to significant impairment and yet not demonstrate any of the findings involving the differentiators. Therefore, with the Injury Model, "structural inclusions" are included in some of the DRE categories. If the patient has a condition that meets the definition of a category that includes a structural inclusion, the physician need not determine if the other criteria for that category are present.

If the patient demonstrates the structural inclusions of two categories, the physician should place the patient in the category with the higher impairment percent.

## 3.3c  Impressions, Diagnoses, and Impairment Estimates

Impressions should be expressed in logical fashion, progressing from symptoms, such as "back and leg pain," to a documented diagnosis that may or may not be remediable, such as "L5 nerve root compression due to a herniated disk between L4 and L5."

Impairment estimates are based on the history, objective findings and data, impression, and any other information collected during the evaluation. The physician's report should describe and explain any qualifications or inconsistencies that may be present (Report of Medical Evaluation, p. 11). The impairment evaluation report may consider relevant factors, such as the patient's literacy, general capability, and overall health.

## 3.3d  Evaluating Impairments: The Injury or Diagnosis-related Estimates Model

The Injury Model relies not only on the medical history and physical examination, but also on medical data other than those that relate to the range of motion.

What is called osteoarthritis of the spine is due more to increments of age than to injury or illness, while similar structural changes in the hip or glenohumeral joint are more likely to be injury related. For example, roentgenographic evidence of aging changes in the spine, called osteoarthritis, are found in 40% of people by age 35 years,[67] and there is a poor correlation with symptoms, while roentgenographic evidence of osteoarthritic changes of the hip are found in 5% to 7% of 70-year-olds, in whom the correlation with acute injury is greater.

The Injury Model attempts to document physiologic and structural impairments relating to insults other than common developmental findings, such as (1) spondylolysis, found normally in 7% of adults; (2) spondylolisthesis, found in 3%; (3) herniated disk without radiculopathy, found in more than 30% of individuals by age 40 years[53, 62, 71]; and (4) aging changes, common in 40% of adults after age 35 years.[67]

The Injury Model relies especially on evidence of neurologic deficits and uncommon, adverse structural changes, such as fractures, dislocations, and loss of motion segment integrity. Under this model, DREs are differentiated according to clinical findings that are verifiable using standard medical procedures.

With the Injury Model, surgery to treat an impairment does not modify the original impairment estimate, which remains the same in spite of any changes in signs or symptoms that may follow the surgery and irrespective of whether the patient has a favorable or unfavorable response to treatment.

## 3.3e  General Approach and Directions

The medical history, physical examination, and clinical workup described in Sections 3.3a through 3.3c will guide the examiner to the appropriate impairment category. Is there radiculopathy of the lumbosacral spine? This impairment is in lumbosacral impairment category III (Table 72, p. 110). Loss of motion segment or structural integrity of the lumbosacral spine is in category IV. Impairment due to a vertebral body fracture with both radiculopathy and instability would be in category III, IV, or V (Table 70, p. 108), and a vertebral body fracture without either characteristic would be in category II, III, or IV. Categories and tables are provided for the cervicothoracic (Table 73, p. 110), thoracolumbar (Table 74, p. 111), and lumbosacral (Table 72, p. 110) regions.

The physician should start with Table 70 (p. 108) as a guide toward the appropriate category for the spine impairment. A series of differentiators (Table 71, p. 109) describes clinical criteria that correlate with serious physiologic dysfunction or structural change, which the physician should use to help define the patient's impairment. The dysfunctions include documentable neurologic compromise of the limbs (Table 71, p. 109, differentiators 2, 3, and 4) or of bowel or bladder function (Table 71, differentiators 6 and 7) and documentable loss of normal spine motion segment integrity (Table 71, differentiator 5; Figs. 62 and

63, p. 98). Adverse conditions are possible for each spine segment or region, and appropriate DREs are given for all of the regions.

In the Injury Model, the lumbosacral spine segment is considered to represent 75% of total body function; the cervicothoracic spine is considered to represent 35% of total body function; and the thoracolumbar spine is considered to represent 20% of total body function. Thus, the maximum whole-person spine impairments are 75% for the lumbosacral spine and, *without long-tract signs*, 35% for the cervicothoracic spine and 20% for the thoracolumbar spine.

Having a whole-person impairment estimate greater than 35% for the cervicothoracic spine (Table 73, p. 110) or an estimate greater than 20% for the thoracolumbar spine (Table 74, p. 111) depends on the existence of documentable long-tract nervous system signs of bowel and bladder or lower-extremity impairment. If these signs or differentiators, which are explained in Table 71 (p. 109), are present, the examiner may combine an appropriate long-tract impairment percent with the percent for the specific DRE category. Tables 73 and 74 (pp. 110 and 111) explain further the combining of DRE category percents with percents related to long-tract signs.

*Long-tract-sign-related percents are combined only with cervicothoracic and thoracolumbar spine impairments.*

To express a spine impairment and a bladder impairment, or any other combination of organ system impairments, as an impairment of the whole person, the whole-person impairment estimates for the respective organ systems should be *combined* using the Combined Values Chart (p. 322).

Spine-related complaints in category II involve mild to moderately impaired spine function but are considered to be minor impairments. Categories III through VIII relate to specific, documentable findings more serious than those that most people develop without injuries or illnesses and include radiculopathy, loss of motion segment integrity, potentially unstable vertebral body fractures, dislocations, multilevel neurologic dysfunction, and severe neurologic losses. In the last category are the cauda equina-like syndromes associated with loss of lower-limb function, bowel and bladder dysfunction, and paraplegia.

**Table 70.** Spine Impairment Categories for Cervicothoracic, Thoracolumbar, and Lumbosacral Regions.

| Patient's condition | Category | | | | | Category * | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | I | II | III | IV | V | VI | VII | VIII |
| Complaints or symptoms | I | | | | | | | |
| Vertebral body compression, less than 25% | | II | | | | | | |
| Posterior element fracture, healed, stable, no dislocation or radiculopathy | | II | | | | | | |
| Transverse or spinous process fracture with dislocation of fragment, healed, stable | | II | | | | | | |
| Vertebral body compression fracture 25%–50% | | | III | | | | | |
| Posterior element fracture with spinal canal displacement or radiculopathy, healed, stable | | | III | | | | | |
| Radiculopathy | | | III | | | | | |
| Loss of motion segment integrity | | | | IV | | | | |
| Vertebral body compression, greater than 50% | | | | IV | V | | | |
| Multilevel structural compromise | | | | IV | V | | | |
| Cauda equina syndrome *without* bowel or bladder impairment | | | | | | VI | | |
| Cauda equina syndrome *with* bowel or bladder impairment | | | | | | | VII | |
| Paraplegia | | | | | | | | VIII |
| Spondylolysis *without* loss of motion segment integrity or radiculopathy | I | II | | | | | | |
| Spondylolysis *with* loss of motion segment integrity or radiculopathy | | | III | IV | V | | | |
| Spondylolisthesis *without* loss of motion segment integrity or radiculopathy | I | II | | | | | | |
| Spondylolisthesis *with* loss of motion segment integrity or radiculopathy | | | III | IV | V | | | |
| Spondylolisthesis *with* cauda equina syndrome | | | | | | VI | VII | VIII |
| Vertebral body fracture *without* loss of motion segment integrity or radiculopathy | | II | III | IV | | | | |
| Vertebral body fracture *with* loss of motion segment integrity or radiculopathy | | | III | IV | V | | | |
| Vertebral body fracture *with* cauda equina syndrome | | | | | | VI | VII | VIII |
| Vertebral body dislocation *without* loss of motion segment integrity or radiculopathy | | II | III | IV | | | | |
| Vertebral body dislocation *with* loss of motion segment integrity or radiculopathy | | | III | IV | V | | | |
| Vertebral body dislocation *with* cauda equina syndrome | | | | | | VI | VII | VIII |
| Previous spine operation *without* loss of motion segment integrity or radiculopathy | | II | III | IV | | | | |
| Previous spine operation *with* loss of motion segment integrity or radiculopathy | | | III | IV | V | | | |
| Previous spine operation *with* cauda equina syndrome | | | | | | VI | VII | VIII |
| Stenosis, or facet arthrosis or disease, or disk arthrosis | I | II | | | | | | |

*Long-tract categories VI, VII, and VIII for long-tract signs may be combined (Combined Values Chart, p. 322) with impairment percents of cervicothoracic categories II–V or thoracolumbar categories II–IV (see Tables 73 and 74, pp. 110 and 111).

An impairment estimate in thoracolumbar category VIII should be combined with an appropriate estimate from thoracolumbar category II, III, or IV using the Combined Values Chart (p. 322).

*Example:* An 18-year-old man fell from a roof and suffered a TI2 burst fracture. Examination when the man's signs and symptoms were stable indicated he had neurologic impairment of the lower legs meeting thoracolumbar category III criteria and bladder and bowel impairment meeting thoracolumbar category VII criteria. To determine the whole-person impairment, the impairment percent for the radicular signs would be combined with that for the cauda equina syndrome.

*Impairment:* 15% (thoracolumbar category III or IIIB, Table 74, p. 111) combined with 55% (thoracolumbar category VII, Table 74) is 62% (Combined Values Chart, p. 322). Thus, the patient has a 62% whole-person impairment.

---

**Table 71.** DRE Impairment Category Differentiators.

In many cases, as with patients who have localized, severe pressure on spinal nerve roots, physicians can differentiate one type of impairment from another. But it may be difficult to reach agreement when the clinical findings are not obvious. The criteria below will help differentiate spine impairments and place them in impairment categories for the cervicothoracic, thoracolumbar, and lumbosacral regions.

The more objective and important differentiators are marked with an asterisk; the physician should use these to determine the highest impairment category. If the physician cannot place a patient's impairment in one of the categories, or if there is disagreement about the most appropriate category, he or she should use the Range of Motion Model (Section 3.3j, p. 113) to evaluate the magnitude of the impairment and identify the most appropriate category (see Sections 3.3b, p. 95, and 3.3f, p. 101).

**1. Guarding**
Paravertebral muscle guarding or spasm or nonuniform loss of range of motion, dysmetria, is present or has been documented by a physician. Radicular complaints that follow anatomic pathways but cannot be verified by neurologic findings belong with this type of differentiator.

**2. Loss of reflexes**
Spine-injury-related loss of arm or leg reflexes is present; this may be verified by differentiator 4 below.

**3. Decreased circumference, atrophy**
Spine-injury-related circumferential measurements show loss of girth of 2 cm or more above or below the elbow or knee. The atrophy cannot be explained by non-spine-related problems or contralateral hypertrophy, as might occur with a dominant limb or greatly increased use of a limb. The neurologic impairment may be verified by differentiator 4 below.

**4.* Electrodiagnostic evidence**
Unequivocal electrodiagnostic evidence exists of acute nerve root compromise, such as multiple positive sharp waves or fibrillation potentials; or H-wave absence or delay greater than 3 mm/sec; or chronic changes such as polyphasic waves in peripheral muscles.

**5.* Loss of motion segment integrity**
Flexion and extension comparison roentgenograms show significant injury-related anterior-to-posterior translation of two adjacent vertebral bodies of 5 mm or more in the lumbar or thoracic spine, or of 3.5 mm or more in the cervical spine; or the roentgenograms show 15° more angular motion in the sagittal plane of L5 and S1 than at L4 and L5, or 11° more angular motion in the sagittal plane of a motion segment above L5 than in the adjacent motion segment. See Figs. 62 and 63 (p. 98).

**6. Loss of bowel or bladder control**
Rectal examination indicates loss of sphincter tone, or there is loss of bladder control requiring the use of an assistive device such as a catheter.

**7.* Bladder studies**
Cystometrograms show unequivocal neurologic compromise of the bladder with resulting incontinence.

---

*More objective and important differentiators.

**Table 72.** DRE Lumbosacral Spine Impairment
Categories.

| DRE impairment category | Description | % Impairment of the whole person |
|---|---|---|
| I | Complaints or symptoms | 0 |
| II | Minor impairment: clinical signs of lumbar injury are present without radiculopathy or loss of motion segment integrity | 5 |
| III | Radiculopathy: evidence of radiculopathy is present | 10 |
| IV | Loss of motion segment integrity: criteria for this condition are described in Section 3.3b, p. 95 | 20 |
| V | Radiculopathy and loss of motion segment integrity | 25 |
| VI | Cauda equina-like syndrome *without* bowel or bladder impairment | 40 |
| VII | Cauda equina syndrome *with* bowel or bladder impairment | 60 |
| VIII | Paraplegia | 75 |

**Table 73.** DRE Cervicothoracic Spine Impairment Categories.*

| DRE impairment category | Description | % Impairment of the whole person | Impairment (%) with long-tract signs* combined | | |
|---|---|---|---|---|---|
| | | | VI (40) | VII (60) | VIII (75) |
| I | Complaints or symptoms | 0 | | | |
| II | Minor impairment: clinical signs of neck injury are present without radiculopathy or loss of motion segment integrity | 5 | 43 | 62 | 76 |
| III | Radiculopathy: evidence of radiculopathy is present | 15 | 49 | 66 | 79 |
| IV | Loss of motion segment integrity or multilevel neurologic compromise | 25 | 55 | 70 | 81 |
| V | Severe upper extremity neurologic compromise: single-level or multilevel loss of function | 35 | 61 | 74 | 84 |
| VI | Cauda equina syndrome *without* bowel or bladder impairment | 40 | The 40% impairment for category VI must be combined with the impairment percent from the most appropriate cervicothoracic impairment category, II, III, IV, or V. | | |
| VII | *Cauda equina* syndrome *with* bowel or bladder impairment | 60 | The 60% impairment for category VII must be combined with the impairment percent from the most appropriate cervicothoracic impairment category, II, III, IV, or V. | | |
| VIII | Paraplegia | 75 | The 75% impairment for category VIII must be combined with the impairment percent from the most appropriate cervicothoracic impairment category, II, III, IV, or V. | | |

*If a patient has an impairment in cervicothoracic spine impairment category VI, VII, or VIII, the appropriate impairment percent should be *combined* (Combined Values Chart, p. 322) with the percent in cervicothoracic impairment category II, III, IV, or V that best reflects the patient's condition.

If the patient's bowel or bladder function is impaired and there is no cervicothoracic or lower-limb impairment that meets the criteria of categories VI, VII, or VIII, the impairment should be evaluated according to criteria in the *Guides* chapters on the digestive or urinary and reproductive systems.

# 3.3j  The Range of Motion Model

Determining the range of motion of a patient's spine is a clinically useful procedure,[68] and it is the second of the two methods recommended in the *Guides* for evaluating spine impairment. This approach uses a diagnosis-based component, based on Table 75 (p. 113), a method for determining the range of motion of the impaired spine region described in this section, and a component based on any spinal nerve deficit (Section 3.1k, p. 46).

The Range of Motion Model should be used only if the Injury Model is not applicable, or if more clinical data on the spine are needed to categorize the individual's spine impairment.

The spine consists of three major regions: cervical, thoracic, and lumbar (Fig. 64, below). Under the *Guides* approach to impairment evaluation, the spine is considered to be equivalent to the whole person. As described in Section 3.3b (p. 95), with the Range of Motion Model, the cervical spine is considered to be involved with 80% of the individual's functioning, the thoracic spine involved with 40%, and the lumbosacral spine involved with 90%.

All impairment estimates shown in the tables of this section are expressed as whole-person impairments. Section 3.3k (p. 135) explains how to express a whole-person spine impairment as a regional spine impairment. The tables in this section provide estimates for judging ankylosis as well as range of motion impairments.

Regional spine motion is a compound motion, and it is essential to measure simultaneously the motion of both the upper and lower extremes of the spine region being examined. Because the small joints of the spine do not lend themselves readily to goniometer measurements, and the difficulty of measuring a spine segment's mobility is compounded by motion above and below the measurement points, using an inclinometer is a better way of obtaining accurate, reproducible measurements in a simple, practical, and inexpensive way.

The data on standards and normal functioning described in this section are based both on medical studies and consensus judgments. The impairment measurements and estimates involving the three major regions should be recorded in Figs. 77-80 (pp. 132-134).

### General Measurement Principles

An individual's impairment should be evaluated when the impairment has become stable after the completion of all necessary medical, surgical, and rehabilitative treatment. This principle precludes performing the evaluation when acute illness is present. If acute muscle spasm is present, this should be noted in the examiner's report; however, the mobility measurements would *not* be valid for estimating permanent impairment, because by definition the evaluation must be carried out when the acute condition has resolved.

Pain, fear of injury, or neuromuscular inhibition may limit mobility by diminishing the patient's effort, leading to inaccurately low and inconsistent measurements and inflated impairment estimates. The reproducibility of a patient's performance is one indicator of an optimum effort.

In measuring a range of motion, the examiner should select at least three consecutive measurements and calculate the mean or average of the three. If the average is less than 50°, three of the measurements must fall within 5° of it; if the average is greater than 50°, three measurements must fall within 10% of it. Measurements may be repeated up to six times to obtain three *consecutive* measurements that meet these criteria. If inconsistency persists, all measurements of that part of the examination are invalid.

An impairment based on loss of mobility is valid only if there is medical evidence of a documented injury or illness with a physiologic residual.

**Figure 64.** The Whole Spine Divided Into Regions Indicating the Maximum Whole-person Impairment Represented by Total Impairment of One Region (Range of Motion Model).



Cervical 80%

Thoracic 40%

Lumbosacral 90%

**Table 75.** Whole-person Impairment Percents Due to Specific Spine Disorders.*

| Disorder | % Impairment of the whole person | | |
|---|---|---|---|
| | Cervical | Thoracic | Lumbar |
| **I. Fractures:** | | | |
| A. Compression of one vertebral body | | | |
|     0%-25% | 4 | 2 | 5 |
|     26%-50% | 6 | 3 | 7 |
|     >50% | 10 | 5 | 12 |
| B. Fracture of posterior element (pedicle, lamina, articular process, transverse process) | 4 | 2 | 5 |
| Note: An impairment due to compression of a vertebra and one due to fracture of a posterior element are combined using the Combined Values Chart (p. 322). Fractures or compressions of several vertebrae are combined using the Combined Values Chart. | | | |
| C. Reduced dislocation of one vertebra. | 5 | 3 | 6 |
|     If two or more vertebrae are dislocated and reduced, combine the estimates using the Combined Values Chart (p. 322). An unreduced dislocation causes impairment until it is reduced; the physician should then evaluate the impairment on the basis of the subject's condition with the dislocation reduced. If no reduction is possible, the physician should evaluate the impairment on the basis of the range of motion and the neurologic findings according to criteria in this chapter and the nervous system chapter. | | | |
| **II. Intervertebral disk or other soft-tissue lesion** | | | |
| A. Unoperated on, with no residual signs or symptoms | 0 | 0 | 0 |
| B. Unoperated on, stable, with medically documented injury, pain, and rigidity† associated with none to minimal degenerative changes on structural tests, such as those involving roentgenography or magnetic resonance imaging. | 4 | 2 | 5 |
| C. Unoperated on, stable, with medically documented injury, pain, and rigidity† associated with moderate to severe degenerative changes on structural tests; includes unoperated on herniated nucleus pulposus with or without radiculopathy | 6 | 3 | 7 |
| D. Surgically treated disk lesion without residual signs or symptoms; includes disk injection | 7 | 4 | 8 |
| E. Surgically treated disk lesion with residual, medically documented pain and rigidity | 9 | 5 | 10 |
| F. Multiple levels, with or without operations and with or without residual signs or symptoms | Add 1% per level | | |
| G. Multiple operations with or without residual symptoms: | | | |
|     1. Second operation | Add 2% | | |
|     2. Third or subsequent operation | Add 1% per operation | | |
| **III. Spondylolysis and spondylolisthesis, not operated on** | | | |
| A. Spondylolysis or grade I (1%-25% slippage); or grade II (26%-50% slippage) spondylolisthesis, accompanied by medically documented injury that is stable, and medically documented pain and rigidity with or without muscle spasm | 6 | 3 | 7 |
| B. Grade III (51%-75% slippage) or grade IV (76%-100% slippage) spondylolisthesis, accompanied by medically documented injury that is stable and medically documented pain and rigidity with or without muscle spasm | 8 | 4 | 9 |
| **IV. Spinal stenosis, segmental instability, spondylolisthesis, fracture, or dislocation, operated on** | | | |
| A. Single-level decompression without spinal fusion and without residual signs or symptoms | 7 | 4 | 8 |
| B. Single-level decompression with residual signs or symptoms | 9 | 5 | 10 |
| C. Single-level spinal fusion with or without decompression without residual signs or symptoms | 8 | 4 | 9 |
| D. Single-level spinal fusion with or without decompression with residual signs or symptoms | 10 | 5 | 12 |
| E. Multiple levels, operated on, with residual, medically documented pain and rigidity with or without muscle spasm | Add 1% per level | | |
|     1. Second operation | Add 2% | | |
|     2. Third or subsequent operation | Add 1% per operation | | |

*Instructions:

1. Identify the most significant impairment of the primarily involved region.

2. The diagnosis-based impairment estimates and percents shown above should be combined with range of motion impairment estimates and with whole-person impairment estimates involving sensation, weakness, and conditions of the musculoskeletal, nervous, or other organ systems.

3. List the diagnosis-based, range of motion, and other whole-person impairment estimates on the Spine Impairment Summary Form (Fig. 80, p. 134).

†The words "with medically documented injury, pain, and rigidity" imply not only that an injury or illness has occurred, but also that the condition is stable, as shown by the evaluator's history, examination, and other data, and that a permanent impairment exists, which is at least partly due to the condition being evaluated and not only due to preexisting disease.

# Glossary

efinitions related to impairment assume importance, because terms associated with impairment evaluations may have special meanings in a legal context beyond their usual meanings in medical communications. This glossary provides a guide to the terms that should be used in reporting, analyzing, understanding, and discussing impairment evaluations and estimates carried out according to *Guides* criteria. It also defines important terms in the fields of disability, workers' compensation, and short- and long-term disability and considers Social Security System disability determinations and the Americans with Disabilities Act of 1992.

## Terms Used in Assessments According to *Guides*

*1. Impairment:* Impairment is the loss, loss of use, or derangement of any body part, system, or function.

*Permanent impairment* is impairment that has become static or well stabilized with or without medical treatment and is not likely to remit despite medical treatment.

A permanent impairment is considered to be unlikely to change substantially and by more than 3% in the next year with or without medical treatment. If an impairment is not *permanent*, it is inappropriate to characterize it as such and evaluate it according to *Guides* criteria.

*Evaluation of permanent impairment* is acquisition and analysis of information, including clinical evaluation, that is carried out according to Chapters 1 and 2 and other applicable parts of the *Guides*.

*Impairment rating* consists of analyzing data accumulated in the course of an impairment evaluation and comparing those data with *Guides* criteria to estimate the extent of the impairment. Impairment ratings prepared according to *Guides* criteria are *estimates* of impairment.

*Impairment reporting* is explaining the information acquired in the course of evaluating, analyzing, and estimating the extent of an impairment. An impairment report should be prepared according to the procedures described in Chapter 2 and other applicable parts of the *Guides*.

*2. Apportionment:* This is an estimate of the degree to which each of various occupational or nonoccupational factors may have caused or contributed to a particular impairment. For each alleged factor, two criteria must be met:

a. The alleged factor *could have caused* or contributed to the impairment, which is a medical determination (see "causation," p. 316).

b. In the case in question, the factor *did cause* or contribute to the impairment, which usually is a nonmedical determination. The physician's analysis and explanation of causation is significant.